**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

————————

**No. 11-1111**

————————

GREATER BALTIMORE CENTER FOR PREGNANCY CONCERNS, INCORPORATED,

        Plaintiff – Appellee,

    and

ST. BRIGID'S ROMAN CATHOLIC CONGREGATION INCORPORATED; ARCHBISHOP WILLIAM E. LORI, as successor to Archbishop Edwin F. O'Brien, Archbishop of Baltimore, and his successor in office, a corporation sole,

        Plaintiffs,

    v.

MAYOR AND CITY COUNCIL OF BALTIMORE; STEPHANIE RAWLINGS-BLAKE, Mayor of Baltimore, in her Official Capacity; OXIRIS BARBOT, Baltimore City Health Commissioner,

        Defendants – Appellants,

    and

OLIVIA FARROW; BALTIMORE CITY HEALTH DEPARTMENT,

        Defendants.

------------------------------

TAUNYA LOVELL BANKS, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; C. CHRISTOPHER BROWN, Associate Professor Emeritus of Law, University of Maryland School of Law; ERWIN CHEMERINSKY, Dean and Distinguished Professor of Law, University of California, Irvine School of Law; ROBERT J. CONDLIN, Professor of Law, University of Maryland School of Law; NORMAN DORSEN, Frederick I. and Grace A. Stokes Professor

of Law, New York University School of Law; LEIGH GOODMARK, Associate Professor of Law, University of Baltimore School of Law; STEVEN P. GROSSMAN, Dean Julius Isaacson Professor of Law, University of Baltimore School of Law; MARTIN GUGGENHEIM, Fiorello LaGuardia Professor of Clinical Law, New York University School of Law; DEBORAH HELLMAN, Professor of Law and Jacob France Research Professor, University of Maryland School of Law; MARGARET E. JOHNSON, Assistant Professor of Law, University of Baltimore School of Law; KENNETH LASSON, Professor of Law, University of Baltimore School of Law; SYLVIA A. LAW, Elizabeth K. Dollard Professor of Law, Medicine and Psychiatry, New York University School of Law; SUSAN PAULA LEVITON, Professor of Law, University of Maryland School of Law; AUDREY MCFARLANE, Professor of Law, University of Baltimore School of Law; PAULA A. MONOPOLI, Professor of Law, University of Maryland School of Law; BURT NEUBORNE, Inez Milholland Professor of Civil Liberties, New York University School of Law; JOHN T. NOCKLEBY, Professor of Law, Loyola Law School; HELEN L. NORTON, Associate Professor of Law, University of Colorado School of Law; DAVID A.J. RICHARDS, Edwin D. Webb Professor of Law, New York University School of Law; ELIZABETH J. SAMUELS, Professor of Law, University of Baltimore School of Law; ELIZABETH M. SCHNEIDER, Rose L. Hoffer Professor of Law, Brooklyn Law School; JANA B. SINGER, Professor of Law, University of Maryland School of Law; BARBARA ANN WHITE, Professor of Law, University of Baltimore School of Law; TOBIAS BARRINGTON WOLFF, Professor of Law, University of Pennsylvania Law School; DIANE L. ZIMMERMAN, Samuel Tilden Professor of Law Emerita, New York University School of Law; INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; AMERICAN MEDICAL WOMEN'S ASSOCIATION; ROBERT BLUM; WILLARD CATES, JR.; CHESAPEAKE REGIONAL CHAPTER OF THE SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; ERIC LEVEY; MATERNAL AND CHILD HEALTH ACCESS; NADINE PEACOCK; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; MARK SEIGEL; LAURIE SCHWAB ZABIN; EVA MOORE; CATHOLICS FOR CHOICE; DC ABORTION FUND; DIANA DEGETTE; DONNA EDWARDS; LAW STUDENTS FOR REPRODUCTIVE JUSTICE; CAROLYN MALONEY; MARYLAND CHAPTER FOR THE NATIONAL ORGANIZATION FOR WOMEN; NARAL PRO-CHOICE AMERICA; NARAL PRO-CHOICE MARYLAND; NATIONAL ABORTION FEDERATION; NATIONAL ADVOCATES FOR PREGNANT WOMEN; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; PLANNED PARENTHOOD OF MARYLAND; MIKE QUIGLEY; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SISTERSONG WOMEN OF COLOR REPRODUCTIVE JUSTICE COLLECTIVE; LOUISE SLAUGHTER; JACKIE SPEIER; WHOLE WOMAN'S HEALTH OF BALTIMORE; WOMEN'S LAW CENTER OF

MARYLAND, INCORPORATED; HUMAN RIGHTS WATCH; SUSAN DELLER ROSS, Professor; ELIJAH CUMMINGS,

Amici Supporting Appellants,

PREGNANCY CARE ORGANIZATIONS CARE NET; HEARTBEAT INTERNATIONAL, INCORPORATED; NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; ROCKA-MY-BABY PREGNANCY CRISIS CENTER; BOWIE CROFTON PREGNANCY CLINIC, INCORPORATED; CARE NET PREGNANCY CENTER OF FREDERICK; CARE NET PREGNANCY CENTER OF SOUTHERN MARYLAND; LAUREL PREGNANCY CENTER; ROCKVILLE PREGNANCY CENTER, INCORPORATED; AMERICAN CENTER FOR LAW AND JUSTICE; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; CATHOLIC MEDICAL ASSOCIATION; HELEN M. ALVARE, Associate Professor of Law, George Mason University School of Law; ROBERT JOHN ARAUJO, S.J., John Courtney Murray, S.J. University Professor, Loyola University of Chicago School of Law; ROBERT F. COCHRAN, JR., Louis D. Brandeis Professor of Law, Pepperdine University School of Law; DAVID DEWOLF, Professor, Gonzaga University School of Law; DWIGHT G. DUNCAN, Professor of Law, University of Massachusetts Dartmouth School of Law; JOHN C. EASTMAN, Henry Salvatori Professor of Law & Community Service, former Dean, Chapman University School of Law; SCOTT T. FITZGIBBON, Professor, Boston College Law School; RICHARD W. GARNETT, Associate Dean and Professor of Law, Notre Dame Law School; BRADLEY P. JACOB, Associate Professor, Regent University School of Law; DREW L. KERSHEN, Earl Sneed Centennial Professor of Law, University of Oklahoma College of Law; LYNNE MARIE KOHM, John Brown McCarty Professor of Family Law, Regent University School of Law; RICHARD S. MYERS, Professor of Law, Ave Maria School of Law; MICHAEL STOKES PAULSEN, Distinguished University Chair and Professor, University of St. Thomas School of Law; ROBERT J. PUSHAW, James Wilson Endowed Professor of Law, Pepperdine University School of Law; MICHAEL SCAPERLANDA, Professor of Law, Gene & Elaine Edwards Family Chair in Law, The University of Oklahoma College of Law; GREGORY C. SISK, Pio Cardinal Laghi Distinguished Chair in Law and Professor, University of St. Thomas School of Law; O. CARTER SNEAD, Professor of Law, Notre Dame Law School; RICHARD STITH, Professor of Law, Valparaiso University School of Law; TIMOTHY J. TRACEY, Assistant Professor of Law, Ave Maria School of Law; LYNN D. WARDLE, Bruce C. Hafen Professor of Law, J. Reuben Clark Law School, Brigham Young University; THE NATIONAL LEGAL FOUNDATION,

Amici Supporting Appellees.

_____

**No. 11-1185**
_____

ST. BRIGID'S ROMAN CATHOLIC CONGREGATION INCORPORATED; ARCHBISHOP WILLIAM E. LORI, as successor to Archbishop Edwin F. O'Brien, Archbishop of Baltimore, and his successor in office, a corporation sole,

        Plaintiffs – Appellants,

    and

GREATER BALTIMORE CENTER FOR PREGNANCY CONCERNS, INCORPORATED,

        Plaintiff,

    v.

MAYOR AND CITY COUNCIL OF BALTIMORE; STEPHANIE RAWLINGS-BLAKE, Mayor of Baltimore, in her Official Capacity; OXIRIS BARBOT, Baltimore City Health Commissioner,

        Defendants – Appellees,

    and

OLIVIA FARROW; BALTIMORE CITY HEALTH DEPARTMENT,

        Defendants.

------------------------------

HELEN M. ALVARE, Associate Professor of Law, George Mason University School of Law; AMERICAN CENTER FOR LAW AND JUSTICE; AMERICAN ASSOCIATION OF PRO-LIFE OBSTETRICIANS AND GYNECOLOGISTS; ROBERT JOHN ARAUJO, S.J., John Courtney Murray, S.J. University Professor, Loyola University of Chicago School of Law; BOWIE CROFTON PREGNANCY CLINIC, INCORPORATED; CARE NET PREGNANCY CENTER OF FREDERICK; CARE NET PREGNANCY CENTER OF SOUTHERN MARYLAND; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; CATHOLIC MEDICAL

4

ASSOCIATION; ROBERT F. COCHRAN, JR., Louis D. Brandeis Professor of Law, Pepperdine University School of Law; DAVID DEWOLF, Professor, Gonzaga University School of Law; DWIGHT G. DUNCAN, Professor of Law, University of Massachusetts Dartmouth School of Law; JOHN C. EASTMAN, Henry Salvatori Professor of Law & Community Service, former Dean, Chapman University School of Law; SCOTT T. FITZGIBBON, Professor, Boston College Law School; RICHARD W. GARNETT, Associate Dean and Professor of Law, Notre Dame Law School; HEARTBEAT INTERNATIONAL, INCORPORATED; BRADLEY P. JACOB, Associate Professor, Regent University School of Law; DREW L. KERSHEN, Earl Sneed Centennial Professor of Law, University of Oklahoma College of Law; LYNNE MARIE KOHM, John Brown McCarty Professor of Family Law, Regent University School of Law; LAUREL PREGNANCY CENTER; RICHARD S. MYERS, Professor of Law, Ave Maria School of Law; NATIONAL INSTITUTE OF FAMILY AND LIFE ADVOCATES; MICHAEL STOKES PAULSEN, Distinguished University Chair and Professor, University of St. Thomas School of Law; PREGNANCY CARE ORGANIZATIONS CARE NET; ROBERT J. PUSHAW, James Wilson Endowed Professor of Law, Pepperdine University School of Law; ROCKA-MY-BABY PREGNANCY CRISIS CENTER; ROCKVILLE PREGNANCY CENTER, INCORPORATED; MICHAEL SCAPERLANDA, Professor of Law, Gene & Elaine Edwards Family Chair in Law, The University of Oklahoma College of Law; GREGORY C. SISK, Pio Cardinal Laghi Distinguished Chair in Law and Professor, University of St. Thomas School of Law; O. CARTER SNEAD, Professor of Law, Notre Dame Law School; RICHARD STITH, Professor of Law, Valparaiso University School of Law; TIMOTHY J. TRACEY, Assistant Professor of Law, Ave Maria School of Law; LYNN D. WARDLE, Bruce C. Hafen Professor of Law, J. Reuben Clark Law School, Brigham Young University; THE NATIONAL LEGAL FOUNDATION,

Amici Supporting Appellants,

TAUNYA LOVELL BANKS, Jacob A. France Professor of Equality Jurisprudence, University of Maryland School of Law; C. CHRISTOPHER BROWN, Associate Professor Emeritus of Law, University of Maryland School of Law; ERWIN CHEMERINSKY, Dean and Distinguished Professor of Law, University of California, Irvine School of Law; ROBERT J. CONDLIN, Professor of Law, University of Maryland School of Law; NORMAN DORSEN, Frederick I. and Grace A. Stokes Professor of Law, New York University School of Law; LEIGH GOODMARK, Associate Professor of Law, University of Baltimore School of Law; STEVEN P. GROSSMAN, Dean Julius Isaacson Professor

5

of Law, University of Baltimore School of Law; MARTIN GUGGENHEIM, Fiorello LaGuardia Professor of Clinical Law, New York University School of Law; DEBORAH HELLMAN, Professor of Law and Jacob France Research Professor, University of Maryland School of Law; MARGARET E. JOHNSON, Assistant Professor of Law, University of Baltimore School of Law; KENNETH LASSON, Professor of Law, University of Baltimore School of Law; SUSAN PAULA LEVITON, Professor of Law, University of Maryland School of Law; SYLVIA A. LAW, Elizabeth K. Dollard Professor of Law, Medicine and Psychiatry, New York University School of Law; AUDREY MCFARLANE, Professor of Law, University of Baltimore School of Law; PAULA A. MONOPOLI, Professor of Law, University of Maryland School of Law; BURT NEUBORNE, Inez Milholland Professor of Civil Liberties, New York University School of Law; JOHN T. NOCKLEBY, Professor of Law, Loyola Law School; HELEN L. NORTON, Associate Professor of Law, University of Colorado School of Law; DAVID A.J. RICHARDS, Edwin D. Webb Professor of Law, New York University School of Law; ELIZABETH M. SCHNEIDER, Rose L. Hoffer Professor of Law, Brooklyn Law School; ELIZABETH J. SAMUELS, Professor of Law, University of Baltimore School of Law; JANA B. SINGER, Professor of Law, University of Maryland School of Law; BARBARA ANN WHITE, Professor of Law, University of Baltimore School of Law; TOBIAS BARRINGTON WOLFF, Professor of Law, University of Pennsylvania Law School; DIANE L. ZIMMERMAN, Samuel Tilden Professor of Law Emerita, New York University School of Law; INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION; AMERICAN MEDICAL WOMEN'S ASSOCIATION; MATERNAL AND CHILD HEALTH ACCESS; PHYSICIANS FOR REPRODUCTIVE CHOICE AND HEALTH; CHESAPEAKE REGIONAL CHAPTER OF THE SOCIETY FOR ADOLESCENT HEALTH AND MEDICINE; ROBERT BLUM; WILLARD CATES, JR.; ERIC LEVEY; NADINE PEACOCK; MARK SEIGEL; LAURIE SCHWAB ZABIN; EVA MOORE; NARAL PRO-CHOICE MARYLAND; NARAL PRO-CHOICE AMERICA; CATHOLICS FOR CHOICE; DC ABORTION FUND; LAW STUDENTS FOR REPRODUCTIVE JUSTICE; NATIONAL ABORTION FEDERATION; MARYLAND CHAPTER FOR THE NATIONAL ORGANIZATION FOR WOMEN; NATIONAL ADVOCATES FOR PREGNANT WOMEN; NATIONAL ASIAN PACIFIC AMERICAN WOMEN'S FORUM; PLANNED PARENTHOOD OF MARYLAND; RELIGIOUS COALITION FOR REPRODUCTIVE CHOICE; SISTERSONG WOMEN OF COLOR REPRODUCTIVE JUSTICE COLLECTIVE; WHOLE WOMAN'S HEALTH OF BALTIMORE; WOMEN'S LAW CENTER OF MARYLAND, INCORPORATED; DIANA DEGETTE; DONNA EDWARDS; CAROLYN MALONEY; MIKE QUIGLEY; LOUISE SLAUGHTER; JACKIE SPEIER; HUMAN RIGHTS WATCH; SUSAN DELLER ROSS, Professor; ELIJAH CUMMINGS,

Amici Supporting Appellees.

———————

Appeals from the United States District Court for the District of Maryland, at Baltimore. Marvin J. Garbis, Senior District Judge. (1:10-cv-00760-MJG)

———————

ARGUED: December 6, 2012    Decided: July 3, 2013

———————

Before TRAXLER, Chief Judge, and WILKINSON, NIEMEYER, MOTZ, KING, SHEDD, DUNCAN, AGEE, KEENAN, WYNN, FLOYD, and THACKER, Circuit Judges.

———————

No. 11-1111 vacated and remanded, and No. 11-1185 affirmed, by published opinion. Judge King wrote the majority opinion, in which Chief Judge Traxler and Judges Motz, Duncan, Keenan, Wynn, Floyd, and Thacker joined. Judge Wilkinson wrote a dissenting opinion. Judge Niemeyer wrote a dissenting opinion, in which Judges Wilkinson, Shedd, and Agee joined.

———————

**ARGUED:** Suzanne Sangree, CITY OF BALTIMORE LAW DEPARTMENT, Baltimore, Maryland, for Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. David William Kinkopf, GALLAGHER EVELIUS & JONES, LLP, Baltimore, Maryland, for Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori. **ON BRIEF:** Stephanie Toti, Special Assistant City Solicitor, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Peter J. Basile, FERGUSON, SHETELICH & BALLEW, PA, Baltimore, Maryland; Steven G. Metzger, GALLAGHER EVELIUS & JONES, LLP, Baltimore, Maryland; Mark L. Rienzi, COLUMBUS SCHOOL OF LAW, Catholic University of America, Washington, D.C., for Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori. Maria T. Vullo, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York, for Amici Curiae Law Professors in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake,

7

Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Douglas W. Baruch, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, Washington, D.C.; Janice Mac Avoy, Alexander T. Korn, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON LLP, New York, New York, for International Municipal Lawyers Association, Amicus Curiae in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Simona G. Strauss, Melissa D. Schmidt, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California; Jayma M. Meyer, SIMPSON THACHER & BARTLETT LLP, New York, New York, for Amici Curiae Public Health Advocates in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Kimberly A. Parker, Zaid A. Zaid, Lesley Fredin, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Catholics for Choice, DC Abortion Fund, Donna Edwards, Maryland Chapter for the National Organization for Women, Naral Pro-Choice America, Naral Pro-Choice Maryland, National Abortion Federation, National Advocates for Pregnant Women, National Asian Pacific American Women's Forum, Planned Parenthood of Maryland, Mike Quigley, Religious Coalition for Reproductive Choice, Louise Slaughter, Jackie Speier, Whole Woman's Health of Baltimore, Women's Law Center of Maryland, Incorporated, Elijah Cummings, Amici Curiae in Support of Mayor and City Council of Baltimore, Stephanie Rawlings-Blake, Mayor of Baltimore, in her Official Capacity, and Oxiris Barbot, Baltimore City Health Commissioner. Anna R. Franzonello, Mailee R. Smith, Mary E. Harned, Denise M. Burke, AMERICANS UNITED FOR LIFE, Washington, D.C., for Pregnancy Care Organizations Care Net, Heartbeat International, Incorporated, National Institute of Family and Life Advocates, Rocka-My-Baby Pregnancy Crisis Center, Bowie Crofton Pregnancy Clinic, Incorporated, Care Net Pregnancy Center of Frederick, Care Net Pregnancy Center of Southern Maryland, Laurel Pregnancy Center, and Rockville Pregnancy Center, Incorporated, Amici Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori. Colby M. May, James Matthew Henderson, Sr., Tiffany N. Barrans, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C.; Cecilia N. Heil, Erik M. Zimmerman, AMERICAN CENTER FOR LAW & JUSTICE, Virginia Beach, Virginia; Carly F. Gammill, AMERICAN CENTER FOR LAW & JUSTICE, Franklin, Tennessee, for American Center for Law and Justice, Amicus Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori. Matthew

S. Bowman, ALLIANCE DEFENDING FREEDOM, Washington, D.C.; Samuel B. Casey, David B. Waxman, JUBILEE CAMPAIGN-LAW OF LIFE PROJECT, Washington, D.C., for American Association of Pro-Life Obstetricians and Gynecologists, Christian Medical & Dental Associations, and Catholic Medical Association, Amici Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori. John C. Eastman, CENTER FOR CONSTITUTIONAL JURISPRUDENCE, Chapman University School of Law, Orange, California; David T. Raimer, Noel J. Francisco, JONES DAY, Washington, D.C., for Amici Curiae Professors in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori. Steven W. Fitschen, THE NATIONAL LEGAL FOUNDATION, Virginia Beach, Virginia; John P. Tuskey, BINGHAM AND LOUGHLIN, P.C., Mishawaka, Indiana, for The National Legal Foundation, Amicus Curiae in Support of Greater Baltimore Center for Pregnancy Concerns, Incorporated, St. Brigid's Roman Catholic Congregation, Incorporated, Archbishop William E. Lori.

---

KING, Circuit Judge:

Invoking the First Amendment, the district court fully and permanently enjoined enforcement of a City of Baltimore Ordinance requiring limited-service pregnancy centers to post disclaimers that they do not provide or make referrals for abortions or certain birth-control services. The injunction emanated from the court's award of summary judgment to plaintiff Greater Baltimore Center for Pregnancy Concerns, Incorporated, on its claim that the Ordinance is facially invalid under the Free Speech Clause. See O'Brien v. Mayor of Balt., 768 F. Supp. 2d 804, 812-17 (D. Md. 2011). Crucially, however, the summary judgment decision was laden with error, in that the court denied the defendants essential discovery and otherwise disregarded basic rules of civil procedure. We therefore vacate the judgment and remand for further proceedings, without comment on how this matter ultimately should be resolved.[1]

---

[1] To be clear, we vacate and remand in the appeal (No. 11-1111) noted by defendants Mayor and City Council of Baltimore; Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore; and Oxiris Barbot, in her official capacity as Baltimore City Health Commissioner. We affirm, however, in the cross-appeal (No. 11-1185) of St. Brigid's Roman Catholic Congregation Incorporated and Archbishop William E. Lori, contesting the district court's ruling that they lack standing to be co-plaintiffs with the Greater Baltimore Center for Pregnancy Concerns. See O'Brien, 768 F. Supp. 2d at 811-12. On initial review by a three-judge panel of our Court, the majority affirmed both the district court's summary judgment decision and its standing ruling. See Greater Balt. Ctr. for Pregnancy
(Continued)

10

I.

A.

The challenged Ordinance — City of Baltimore Ordinance 09-252 — was passed by the City Council on November 23, 2009, and approved by the Mayor on December 4, 2009. See J.A. 25-28.[2] The Ordinance applies to limited-service pregnancy centers, defined as "any person":

(1) whose primary purpose is to provide pregnancy-related services; and

(2) who:

    (I) for a fee or as a free service, provides information about pregnancy-related services; but

    (II) does not provide or refer for:

        (A) abortions; or

        (B) nondirective and comprehensive birth-control services.

Id. at 25-26. Under the Ordinance, "[a] limited-service pregnancy center must provide its clients and potential clients

_____

Concerns, Inc. v. Mayor of Balt., 683 F.3d 539 (4th Cir. 2012). The panel opinion was subsequently vacated, however, with the grant of rehearing en banc. See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt., No. 11-1111(L) (4th Cir. Aug. 15, 2012).

[2] Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appeals.

11

with a disclaimer substantially to the effect that the center does not provide or make referral for abortion or birth-control services." Id. at 26. The disclaimer is to be given by way of one or more signs that are "written in English and Spanish," "easily readable," and "conspicuously posted in the center's waiting room or other area where individuals await service." Id.

By an implementing Regulation of the Baltimore City Health Department, nondirective and comprehensive birth-control services are defined as "birth-control services which only a licensed healthcare professional may prescribe or provide." See J.A. 39-40.[3] The Regulation specifies that, if a "center provides or refers for some birth-control services, it may indicate on the disclaimer sign what birth-control services it does provide and/or refer for." Id. at 40. Additionally, the Regulation authorizes a center to "indicate on the disclaimer sign that the sign is required by Baltimore City ordinance." Id.

---

[3] The Joint Appendix contains the original version of the Regulation, adopted on July 15, 2010, which indicated that nondirective and comprehensive birth-control services "may also include other birth-control services." J.A. 39. That language was deleted from the Regulation on September 27, 2010, after being deemed problematic in the course of this litigation. Otherwise, there are no substantive differences between the original and superseding versions of the Regulation.

The Ordinance vests enforcement powers in the Baltimore City Health Commissioner, who, upon "learn[ing] that a pregnancy center is in violation of [the Ordinance]," must "issue a written notice ordering the center to correct the violation within 10 days of the notice or within any longer period that the Commissioner specifies in the notice." J.A. 26. If a center fails to comply with a violation notice, the Commissioner may issue an environmental or a civil citation pursuant to the Baltimore City Code. Id. at 27. The Commissioner may also "pursu[e] any other civil or criminal remedy or enforcement action authorized by law." Id.

B.

This 42 U.S.C. § 1983 action — challenging the constitutionality of the Ordinance — was initiated in the District of Maryland on March 29, 2010, by the Greater Baltimore Center for Pregnancy Concerns (the "Center"), together with St. Brigid's Roman Catholic Congregation and then-Archbishop Edwin F. O'Brien. The plaintiffs' Complaint names as defendants the Mayor and City Council of Baltimore; Stephanie Rawlings-Blake, in her official capacity as Mayor of Baltimore; and Olivia Farrow, in her official capacity as then-Acting Baltimore City Health Commissioner (collectively, the "City"). Since then, two of the parties have been succeeded: now-Cardinal O'Brien by

13

Archbishop William E. Lori, and Farrow by Baltimore City Health Commissioner Oxiris Barbot.[4]

1.

The Complaint reflects that the Center qualifies under the Ordinance as a limited-service pregnancy center, in that it "has as its primary purpose providing pregnancy-related services and provides information about pregnancy-related services as a free service"; "does not refer for or provide abortions"; and "does not refer for, or provide information regarding birth control, other than natural family planning and abstinence."  Complaint ¶¶ 25-26.  The Center offers pregnancy-related services at two locations in Baltimore, including a space owned by St. Brigid's and the Archbishop.  Id. ¶¶ 10, 16-18.  According to the Complaint, the plaintiffs share sincerely held religious beliefs that cause them to oppose abortion and certain forms of birth control.  Id. ¶¶ 40-41, 43-44.  The Complaint alleges that the Ordinance violates the First Amendment rights of free speech, free assembly, and free exercise of religion, plus the Fourteenth Amendment guarantee of equal protection and Maryland's statutory "conscience clause," see Md. Code Ann.,

_____

[4] The plaintiffs consented to dismiss without prejudice their claims against an additional defendant, the Baltimore City Health Department.  See O'Brien, 768 F. Supp. 2d at 808 n.5. Meanwhile, the City voluntarily refrained from enforcing the Ordinance prior to the entry of the district court's judgment.

14

Health-Gen. § 20-214(a)(1) (providing, inter alia, that "[a] person may not be required to . . . refer to any source for[] any medical procedure that results in . . . termination of pregnancy").  The Ordinance is attached to the Complaint as its sole exhibit.

On June 4, 2010, before the City even had answered the Complaint and when there were four days remaining for it to do so, the plaintiffs filed a motion for partial summary judgment under Rule 56 of the Federal Rules of Civil Procedure. Specifically, the plaintiffs sought judgment on their free speech, free assembly, and equal protection claims, contending that the Ordinance is unconstitutional on its face and as applied to them.  The plaintiffs insisted that the strict scrutiny standard applies and cannot be satisfied, because the Ordinance fosters viewpoint discrimination against what they termed "pro-life pregnancy centers" and unjustifiably compels only those centers to engage in government-mandated speech.  The plaintiffs portrayed the Ordinance-mandated sign as ensuring that every conversation at a limited-service pregnancy center begins with the subject of abortion, and conveying the morally offensive message that abortion is available elsewhere and might be considered a good option.

The plaintiffs supported their summary judgment motion with an affidavit of Carol Clews, the Center's Executive Director,

corroborating several of the factual allegations in the Complaint. See J.A. 29-31 (the "Clews Affidavit" of June 3, 2010). The Clews Affidavit asserted that, "[i]f not required by law, the Center would not post the disclaimer compelled by Baltimore City Ordinance 09-252." Id. at 30. The plaintiffs also proffered an excerpt from the "Journal of the City Council" reflecting that the Council rejected proposed amendments to the Ordinance aimed at expanding its disclosure requirements to, e.g., pregnancy centers that refer for abortions but not adoptions. Id. at 296-99.

On June 8, 2010, the City filed a motion to dismiss the Complaint in its entirety, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted, or alternatively to dismiss the claims of St. Brigid's and the Archbishop, under Rule 12(b)(1), for lack of standing. The City characterized the Ordinance as a consumer protection regulation, referring to evidence in the Ordinance's legislative record showing that limited-service pregnancy centers often engage in deceptive advertising to attract women seeking abortion and comprehensive birth-control services, and then use delay tactics to impede the women from accessing those services. According to the City, limited-service pregnancy centers thereby pose a threat to public health, in that the risks and costs of abortion increase as a woman advances through

16

her pregnancy, and that delays in access to the birth control of a woman's choice can leave the woman vulnerable to unintended pregnancy and sexually transmitted diseases.

The parties' respective dispositive motions prompted the district court to enter a Scheduling Order specifying deadlines for further related submissions. In compliance with the Scheduling Order, the plaintiffs filed a response to the City's motion to dismiss on July 2, 2010; the City submitted a reply concerning its dismissal motion, combined with a response to the plaintiffs' motion for summary judgment, on July 16, 2010; and the plaintiffs filed a reply with respect to their summary judgment motion on July 23, 2010.

## 2.

### a.

The City's July 16, 2010 submission included four pieces of evidence from the Ordinance's legislative record that had previously been referenced in the City's motion to dismiss. The first such piece of evidence was a July 2006 report prepared for Congressman Henry A. Waxman entitled "False and Misleading Health Information Provided by Federally Funded Pregnancy Resource Centers." See J.A. 413-30 (the "Waxman Report"). The Waxman Report concerned pro-life pregnancy centers referred to as "pregnancy resource centers," and it recited, in pertinent part, that

17

> [p]regnancy resource centers often mask their pro-life mission in order to attract "abortion-vulnerable clients." This can take the form of advertising under "abortion services" in the yellow pages or obscuring the fact that the center does not provide referrals to abortions in the text of an advertisement. Some centers purchase advertising on internet search engines under keywords that include "abortion" or "abortion clinics." Other advertisements represent that the center will provide pregnant teenagers and women with an understanding of all of their options. For example, "Option Line," a joint venture of [national umbrella organizations] Heartbeat International and Care Net, is a 24-hour telephone hotline that connects pregnant teenagers and women with pregnancy resource centers in their communities. The main page of Option Line's website states at the top, "Pregnant? Need Help? You Have Options," but does not reveal that both Heartbeat International and Care Net represent only pro-life centers or that only non-abortion options will be counseled.

Id. at 417-18 (footnotes omitted). Otherwise, the Waxman Report focused on information that was provided over the telephone by federally funded pregnancy resource centers in fifteen states to investigators posing as pregnant seventeen-year-old girls.

The City's second piece of evidence from the Ordinance's legislative history — a January 2008 report of the NARAL Pro-Choice Maryland Fund entitled "The Truth Revealed: Maryland Crisis Pregnancy Center Investigations" — was premised on visits by investigators to "crisis pregnancy centers" or "CPCs" all located in Maryland. See J.A. 326-412 (the "Maryland Report"). The Maryland Report's findings included the following:

> Maryland Crisis Pregnancy Centers attract clients with their advertisements offering free pregnancy tests and "pregnancy options counseling." This is a very

18

appealing offer for women in a vulnerable time in their lives. After providing free urine pregnancy tests (the kind available at any drug store), women are counseled with only negative information about the option of abortion. They are given wildly inaccurate information about the physical and mental health risks associated with abortion, and informed only about the joys of parenting and adoption. If a client continues to consider abortion, she is given false information about abortion service availability and encouraged to delay her decision. CPCs that offer ultrasounds and [sexually transmitted infection] testing are able to delay clients further through appointment wait times, while also gaining a sense of authority and credibility in their client's eyes as a medical service provider. However, CPCs are not medical centers. They are operated by volunteers who are, in general, poorly trained in women's reproductive health issues and well trained in anti-choice propaganda.

Id. at 334.

The City's third and fourth pieces of evidence from the Ordinance's legislative record consisted of written testimony. Tori McReynolds recounted that, sixteen years earlier, when she was a sixteen-year-old girl who needed to know if she was pregnant, her mother arranged for her to visit a limited-service pregnancy center in central Maryland that "was listed in the phone book under 'Abortion Counseling.'" J.A. 261 (emphasis omitted). McReynolds produced a urine sample for a pregnancy test "and was told that it would take about 45 minutes to know the result." Id. During the waiting period, a woman at the center subjected McReynolds to anti-abortion propaganda. Id. McReynolds testified: "I felt tricked; I was a frightened teenager expecting a discussion about my options and instead I

19

was bullied by an opinionated adult twice my age. . . . Had my mother and I seen a sign at that reception desk informing us that we could not get referrals for abortion or birth control, we would have simply moved on." Id.

Dr. Jodi Kelber-Kaye of the University of Maryland, Baltimore County, testified that, "[a]s an educator of college-aged women," she had "heard countless stories from students who go [to limited-service pregnancy centers], assuming they will get a full range of services and counseling and wind up feeling harassed, coerced, and misinformed." J.A. 273. Dr. Kelber-Kaye also said she was "distressed by the existence of centers that, on purpose, appear to be medical facilities and are not staffed by licensed medical personnel, nor even licensed counselors." Id. "Simply put," Kelber-Kaye concluded, "there should be truth in advertising and, like all consumer products, limited-service pregnancy centers need to be kept honest about what services they actually provide." Id.

### b.

In addition to discussing the foregoing evidence, the City asserted in its July 16, 2010 submission that the plaintiffs' summary judgment request was premature, in that the City had not been afforded the opportunity to conduct discovery or to fully

20

develop expert testimony on key factual issues.[5] The City contended that discovery was needed to test the veracity of the plaintiffs' allegations and to develop evidence tending to refute their claims. Pursuant to former Rule 56(f), the City submitted an affidavit of Special Assistant City Solicitor Stephanie Toti, identifying issues that required discovery. See J.A. 41-43 (the "Rule 56(f) Affidavit" of July 16, 2010); see also Fed. R. Civ. P. 56(f) (2010) (providing that, "[i]f a party opposing the motion [for summary judgment] shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may," inter alia, "deny the motion" or "order a continuance to enable . . . discovery to be undertaken").[6]

The Rule 56(f) Affidavit specified that the City needed "to conduct discovery concerning the advertising that the [plaintiff] Center and other limited-service pregnancy centers employ, [to] demonstrate its deceptive character." J.A. 42. The Affidavit also deemed discovery necessary "to develop

---

[5] In accordance with Federal Rule of Civil Procedure 26(d)(1), the City was constrained to respond to the plaintiffs' summary judgment motion without the benefit of discovery because the parties had not yet conferred as required by Rule 26(f).

[6] By amendment that took effect on December 1, 2010, former Rule 56(f) was carried forward into subdivision (d) without substantial change.

21

factual support for [the City's] argument that the services offered by [the Center] are a form of commerce, and, therefore, the disclaimer required by the Ordinance is commercial speech, subject only to rational basis scrutiny — not strict scrutiny." Id. Additionally, the Affidavit maintained that the City "require[d] the opportunity to develop expert testimony to provide factual support for the propositions that deceptive advertising by limited-service pregnancy centers threatens public health in a variety of ways." Id. at 41. The Affidavit explained that one potential expert, Dr. Laurie Schwab Zabin, had "agreed to provide [the City] with a declaration detailing the harms that can result from delays in women's access to abortion or comprehensive birth control services." Id. at 42. Dr. Zabin had not completed her declaration, however, and was then abroad on vacation. Id.

The Rule 56(f) Affidavit further disclosed that another potential expert, Dr. Robert Blum, had already provided a declaration to the City, which the City in turn included in its July 16, 2010 submission to the district court. See J.A. 44-46 (the "Blum Affidavit" of June 17, 2010). In his Affidavit, Dr. Blum, the Director of the Johns Hopkins University Urban Health Institute, confirmed that "[p]ublic health is advanced when individuals are provided with complete and accurate information about their health care options and the availability of health

care services. This is especially true for women who are facing unintended pregnancies or seeking to control their fertility." Id. at 45. The Blum Affidavit elaborated:

> Women seeking family planning services or pregnancy-related care are at a disadvantage relative to service providers in two ways. First, providers possess more information than consumers. Second, providers possess more power than consumers. As a result, full disclosure of what services a provider is offering, as well as what biases underlie the provision of those services, is needed to ensure that consumers are not deceived or taken advantage of; consumers are able to make fully informed, autonomous decisions about family planning or pregnancy-related care; and consumers have timely access to the services they seek.

Id. at 45-46. According to the Blum Affidavit, the Ordinance "serves important public health goals" by "provid[ing] women with key information they need to make decisions about where to go for reproductive health care." Id. at 45. The City indicated that the Blum Affidavit was representative of evidence it sought to develop during discovery proceedings.

3.

The state of the evidentiary record was discussed during a motions hearing conducted by the district court on August 4, 2010. See J.A. 47-141. The City reiterated its need for discovery to counter the plaintiffs' summary judgment motion, and it requested the opportunity to submit the Ordinance's entire legislative record so that the court could "review all of

23

it and not just the portions that" were included in the City's submission of July 16, 2010. Id. at 127.

For their part, the plaintiffs maintained that no discovery was warranted, in that the district court could apply strict scrutiny and "strike [the Ordinance] down on its face." J.A. 90. In that regard, the plaintiffs asserted that the court could "very clearly rule as a facial matter," looking solely to the Ordinance, its legislative history, and the pertinent case law. Id. According to the plaintiffs, the court would need to consider their as-applied challenge only if it rejected their facial challenge, and even then discovery could be circumscribed. See id. at 90-92 (explaining that the breadth of any discovery, including discovery into the plaintiff Center's operations, "might depend on how wide [the court] feels [the Ordinance is] not facially invalid").

The district court indicated its agreement with the plaintiffs that discovery was unnecessary for a facial review of the Ordinance. See J.A. 108. The court assured the City, however, that discovery would be authorized before the court engaged in any as-applied analysis. Id. at 130. In the court's words, "if what [the Center] did is relevant in this case [the City] will have the discovery . . . . But . . . I don't see where we would advance the ball one way or the other on the

24

facial challenge by knowing what these particular people did."
Id.

Following the motions hearing, the City filed the Ordinance's entire legislative record, including written opinions provided to the City Council by the City Solicitor and Acting Health Commissioner prior to the Ordinance's passage vouching for its legality and efficacy. See J.A. 207-08 (October 23, 2009 letter from City Solicitor George A. Nilson advising that, because the Ordinance "merely requires the disclosure of truthful, non-misleading information relevant to a woman's decision to seek services at a particular location[, it] does not violate the 1st Amendment right to freedom of speech"); id. at 209 (October 21, 2009 memorandum of Acting Health Commissioner Olivia D. Farrow supporting the Ordinance because "[i]t is imperative that all Baltimore City women have the ability to obtain factual and timely advice on all available health care options"). Meanwhile, in response to the district court's inquiry during the motions hearing about whether the plaintiffs might ever refer for abortion (e.g., in the case of incest), the plaintiffs submitted an official statement of the Catholic Church "affirm[ing] the moral evil of every procured abortion." Id. at 178. The court thereafter issued its summary judgment decision and permanent injunction without allowing the City any discovery.

By its summary judgment decision of January 28, 2011, the district court determined that, because the City had submitted and relied upon materials beyond the plaintiffs' Complaint — i.e., the legislative record of the Ordinance — it was appropriate to treat the City's motion to dismiss as a cross-motion for summary judgment. See O'Brien, 768 F. Supp. 2d at 809-10 (citing Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . , matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.")). The court then rebuffed the City's request for discovery, characterizing it as an improper "attempt to generate justifications for the Ordinance following its enactment." Id. at 810 (citing United States v. Virginia, 518 U.S. 515, 533 (1996)). In the court's view, its duty was to "examine whether the Ordinance, on its face, is subject to, and satisfies, the applicable level of scrutiny" — an assessment confined to "the evidence relied on by the Baltimore City Council at the time the Ordinance was passed." Id.

Focusing on the plaintiffs' free speech claim and turning to the question of the applicable standard for its facial review, the district court rejected the City's contention that

rational basis scrutiny applies because the Ordinance is directed at misleading commercial speech. See O'Brien, 768 F. Supp. 2d at 813-14. In doing so, the court looked to the specific characteristics of the plaintiff Center, which the court referred to as the "CENTER." For example, the court observed that

> [t]he overall purpose of the advertisements, services, and information offered by the CENTER is not to propose a commercial transaction, nor is it related to the CENTER's economic interest. The CENTER engages in speech relating to abortion and birth-control based on strongly held religious and political beliefs rather than commercial interests or profit motives. The notion that human life must be respected and protected absolutely from the moment of conception is a central tenet of the CENTER's belief system.

Id. at 813 (internal quotation marks omitted). The court deemed it insignificant that "[t]he CENTER offers services that have value in the commercial marketplace," given that "the offering of free services such as pregnancy tests and sonograms in furtherance of a religious mission fails to equate with engaging in a commercial transaction." Id. at 813-14 (footnote omitted). Indeed, the court likened the free services provided by the Center with "sacramental wine, communion wafers, prayer beads, [and] other objects with commercial value" offered by churches to their congregants. Id. at 814. Tying the former to commercial speech, the court warned, would "subject [the latter] to diminished constitutional protection." Id.

27

In any event, the district court concluded that strict scrutiny would apply even if "the CENTER's speech includes some commercial elements," because any commercial speech "'is inextricably intertwined with otherwise fully protected speech.'" O'Brien, 768 F. Supp. 2d at 814 (quoting Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796 (1988)). The court explained that "[t]he dialogue between a limited-service pregnancy center and an expectant mother begins when the client or prospective client enters the waiting room of the center," and that the presence of an Ordinance-mandated sign (as "a stark and immediate statement about abortion and birth-control") would alter the course of the center's communications with its clients and prospective clients. Id. "At the very least," according to the court, "a disclaimer conspicuous to anyone visiting the CENTER regarding the lack of abortion and birth-control services, mandates the inclusion of a government message concurrent, and intertwined with, [the CENTER's] delivery of fully protected speech." Id.

As an additional reason to apply strict scrutiny, the district court declared that the City "enacted the Ordinance out of disagreement with Plaintiffs' viewpoints on abortion and birth-control," thereby engaging in "a particularly offensive form of content-based discrimination." See O'Brien, 768 F. Supp. 2d at 814-16 (citing Rosenberger v. Rector & Visitors of

28

the Univ. of Va., 515 U.S. 819, 829 (1995) ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.")). The court reasoned that, because "the Ordinance is applicable only to those who will never provide or refer for abortion or [certain] birth-control services," it must have been discriminatorily aimed at "those with strict moral or religious qualms regarding abortion and birth-control." Id. at 815. Again raising the specific characteristics of the plaintiff Center, the court emphasized that "[t]he CENTER's viewpoint, formed on the basis of sensitive religious, moral, and political beliefs, is the overarching reason for its stark refusal to perform or refer for abortions and certain types of birth-control." Id.

Applying strict scrutiny, the district court recognized that the City was obliged to demonstrate that the Ordinance is "'narrowly tailored to promote a compelling [G]overnment interest.'" O'Brien, 768 F. Supp. 2d at 816 (quoting United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000)). On the "compelling interest" question, the court noted that the Ordinance's legislative record was "uneven when demonstrating the depth and severity of the problem relating to limited-service pregnancy centers and deceptive advertising." Id. Nevertheless, the court "assume[d], for purposes of discussion,

29

that the Ordinance was enacted in response to a compelling governmental interest." Id. at 817. Such an assumption was appropriate because the court concluded that "the Ordinance falls considerably short of meeting the 'narrowly tailored' standard." Id.

There were two grounds for the district court's ruling on the narrow tailoring issue. First, "the Ordinance does not provide a 'carve-out' provision for those limited-service pregnancy centers which do not engage in any deceptive practices"; rather, "[t]he disclaimer requirement is imposed irrespective of how forthcoming and transparent a pregnancy center presents itself." O'Brien, 768 F. Supp. 2d at 817. Second, "[i]n lieu of the disclaimer mandate of the Ordinance, [the City] could use or modify existing regulations governing fraudulent advertising to combat deceptive advertising practices by limited-service pregnancy centers," or it "could enact a new content-neutral advertising ordinance applicable to noncommercial entities that directly ameliorate [its] concerns regarding deceptive advertising." Id.

Having resolved that the Ordinance is not narrowly tailored, the district court summarized "that the Ordinance does not meet the strict scrutiny standard," and, thus, "Plaintiffs are entitled to summary judgment with regard to their Freedom of

30

Speech claim." O'Brien, 768 F. Supp. 2d at 817.[7] The court entered its permanent injunction three days later, prohibiting "any action to enforce Baltimore City Ordinance 09-252" on the premise that the Ordinance is facially unconstitutional. See O'Brien v. Mayor of Balt., No. 1:10-cv-00760 (D. Md. Jan. 31, 2011), ECF No. 35.

2.

Notably, although it referred throughout its summary judgment decision to the claims and contentions of the "Plaintiffs," the district court ruled early therein that St. Brigid's and the Archbishop lack standing to be co-plaintiffs with the Center. See O'Brien, 768 F. Supp. 2d at 811-12. Specifically, the court determined that St. Brigid's and the Archbishop could not make the requisite showing of "the existence of a concrete and particularized injury in fact." Id. at 811 (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (outlining the three elements of standing, including "an injury in fact" that is "concrete and particularized," as well as "actual or imminent" (internal quotation marks omitted))). The court explained that — because St. Brigid's and the

_____

[7] In view of its summary judgment award on the free speech claim, the district court deemed the Complaint's other claims to be moot and dismissed them without prejudice. See O'Brien, 768 F. Supp. 2d at 817-18 (addressing free assembly, free exercise, equal protection, and Maryland conscience clause claims).

31

Archbishop simply allow the Center to use a portion of their facilities free of charge, and do not themselves operate any limited-service pregnancy center — they are not subject to either the requirements or penalties set forth in the Ordinance. Id. Moreover, the court found "speculative, at best, the contention that a sign required by the Ordinance on the CENTER's wall will be attributed to the landlord." Id. at 812 (elaborating that "the sign refers to the services provided by the CENTER and would have no reference to the owner of the building in which the CENTER operates").

Accordingly, the district court granted in part the City's dismissal motion, dismissing the claims made by St. Brigid's and the Archbishop for lack of standing. See O'Brien, 768 F. Supp. 2d at 812. Nevertheless, the court permitted St. Brigid's and the Archbishop to participate in the proceedings as amicus curiae and persisted in referring to the "Plaintiffs" collectively. Id.

D.

The parties timely noted these cross-appeals, invoking our jurisdiction under 28 U.S.C. § 1291. As explained below, in the City's appeal, we vacate the district court's judgment and remand for further proceedings on the claims asserted by the Center. In the cross-appeal of St. Brigid's and the Archbishop,

32

we affirm the court's dismissal of their claims for lack of standing.

## II.

The City points to a multitude of flaws in the summary judgment decision, going so far as to contend that we should direct a final judgment in the City's favor. We refrain today from evaluating the ultimate merits of the Center's claims, however, focusing instead on the preliminary errors made by the district court as it rushed to summary judgment. Those errors include the court's denial to the City of essential discovery, its refusal to view in the City's favor what evidence there is, and its verboten factual findings, many premised on nothing more than its own supposition. In these circumstances, it is fitting to simply vacate and remand for properly conducted proceedings.

## A.

Chief among its errors was the district court's award of summary judgment to the Center without allowing the City any discovery. As a general proposition, "summary judgment is appropriate only after 'adequate time for discovery.'" Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). Discovery is usually essential in a contested proceeding prior to summary judgment because "[a] party

33

asserting that a fact . . . is genuinely disputed must support the assertion by," inter alia, "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Obviously, "by its very nature, the summary judgment process presupposes the existence of an adequate record." Doe v. Abington Friends Sch., 480 F.3d 252, 257 (3d Cir. 2007). A district court therefore "must refuse summary judgment 'where the nonmoving party has not had the opportunity to discover information that is essential to [its] opposition.'" Nader v. Blair, 549 F.3d 953, 961 (4th Cir. 2008) (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 n.5 (1986)).

We review for abuse of discretion a district court's denial of discovery prior to ruling on a summary judgment motion. See Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995). "Of course, a district court by definition abuses its discretion when it makes an error of law." Rice v. Rivera, 617 F.3d 802, 811 (4th Cir. 2010) (internal quotation marks omitted). Here, the district court's rationale for denying the City its right to discovery was patently erroneous.

34

1.

The City took "the proper course" when it filed the Rule 56(f) Affidavit, "stating that it could not properly oppose . . . summary judgment without a chance to conduct discovery." See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (internal quotation marks omitted) (deeming summary judgment award premature where, inter alia, court made its award only six weeks after complaint was filed, before significant discovery). Such a request is "broadly favored and should be liberally granted because the rule is designed to safeguard non-moving parties from summary judgment motions that they cannot adequately oppose." Raby v. Livingston, 600 F.3d 552, 561 (5th Cir. 2010) (internal quotation marks omitted); accord Harrods Ltd., 302 F.3d at 245 n.18.

It is no justification for the district court's denial of discovery that the court first converted the City's motion to dismiss into a cross-motion for summary judgment. There are two requirements for a proper Rule 12(d) conversion. The first is that "all parties be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment"; such notice exists, e.g., "[w]hen a party is aware that material outside the pleadings is before the court." Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985) (alterations and internal quotation marks omitted). Here, the court deemed

35

conversion appropriate because the City had submitted and relied upon materials that the court believed to be beyond the plaintiffs' Complaint — specifically, portions of the legislative record of the Ordinance. The City had alerted the court to precedent, however, that "[f]or purposes of Rule 12(b)(6), the legislative history of an ordinance is not a matter beyond the pleadings but is an adjunct to the ordinance which may be considered by the court as a matter of law." Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305, 1312 (4th Cir. 1995), vacated on other grounds, 517 U.S. 1206, readopted with modifications by 101 F.3d 325 (4th Cir. 1996).

Even more damaging to the district court's summary judgment decision, the second requirement for proper conversion of a Rule 12(b)(6) motion is that the parties first "be afforded a reasonable opportunity for discovery." Gay, 761 F.2d at 177 (internal quotation marks omitted); accord E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 450 (4th Cir. 2011) (relying on Gay for conclusion that, because record indicated that parties had not had "opportunity to conduct reasonable discovery," court would have erred by converting dismissal motion to one for summary judgment). Indeed, Rule 12(d) itself prescribes the same discovery required by our case law. See Fed. R. Civ. P. 12(d) (instructing that, when a Rule 12(b)(6) motion is treated as a summary judgment motion, "[a]ll

36

parties must be given a reasonable opportunity to present all the material that is pertinent to the motion").

2.

Despite the foregoing authorities, the district court denied the City discovery on the theory that, because the Center was pursuing a facial challenge to the Ordinance, discovery was not warranted. In the First Amendment context, there are two ways for a plaintiff to mount a facial challenge to a statute. First, the plaintiff may demonstrate "that no set of circumstances exists under which [the law] would be valid, or that the [law] lacks any plainly legitimate sweep." United States v. Stevens, 130 S. Ct. 1577, 1587 (2010) (citations and internal quotation marks omitted). Second, the plaintiff may show that the law is "overbroad [because] a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." Id. (internal quotation marks omitted). In this case, however, the district court did not fairly examine whether the Ordinance is invalid in all or even a substantial number of its applications. Rather, the district court merely accepted the Center's description of itself, and then assumed that all limited-service pregnancy centers share the Center's self-described characteristics.

In effect, by focusing almost exclusively on the Ordinance's application to the Center, the district court

37

conducted an as-applied analysis, rather than a facial review. But to properly employ an as-applied analysis, the court was obliged to first afford the City discovery. See Richmond Med. Ctr. for Women v. Herring, 570 F.3d 165, 172 (4th Cir. 2009) (en banc) (explaining that as-applied challenges, i.e., those "based on a developed factual record and the application of a statute to a specific person," entail "case-by-case analyses"). The court acknowledged as much during its August 4, 2010 motions hearing, when it recognized that discovery proceedings would be necessary to properly evaluate an as-applied challenge to the Ordinance. See J.A. 130 (promising that "if what [the Center] did is relevant in this case [the City] will have the discovery"); see also id. at 127-28 (explaining that the plaintiffs would not presently be entitled to summary judgment "if I'm concerned about what their individual status is").

Furthermore, the City was also entitled to discovery as a precursor to any true facial analysis. In the circumstances of the Center's facial challenge, the district court could not properly evaluate the Ordinance's validity in all or most of its applications without evidence concerning the distinctive characteristics of Baltimore's various limited-service pregnancy centers. Cf. Free Speech Coal., Inc. v. Att'y Gen. of the U.S., 677 F.3d 519, 538 (3d Cir. 2012) (concluding that the district court erred in dismissing a First Amendment facial claim without

38

the factual record needed to "intelligently weigh the legitimate versus problematic applications of the [challenged statutes]"). Thus, regardless of the type of analysis utilized — facial or as-applied — the court abused its discretion by failing to recognize and honor the City's right to discovery.

3.

The district court further abused its discretion by restricting its analysis to the legislative record and dismissing the City's discovery request as a forbidden post-enactment effort to justify the Ordinance. The court relied on the Supreme Court's decision in United States v. Virginia, 518 U.S. 515, 533 (1996), for the proposition that the City's justification cannot be "invented post hoc in response to litigation." The City, however, sought only to augment the record with evidence to support its existing justification — not to invent a new one. As we have previously observed, "courts have routinely admitted evidence . . . to supplement a legislative record or explain the stated interests behind challenged regulations." 11126 Balt. Blvd. v. Prince George's Cnty., Md., 886 F.2d 1415, 1425 (4th Cir. 1989), vacated on other grounds, 496 U.S. 901 (1990). Although "'supplemental' materials cannot sustain regulations where there is no evidence in the pre-enactment legislative record," id., that simply is not the case here.

39

B.

In addition to indefensibly denying the City discovery, the district court flouted the well-known and time-tested summary judgment standard. Under that standard, summary judgment is appropriate only if, as Rule 56 is currently written, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is elementary that, when a court considers a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255. Moreover, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249; see also Redd v. N.Y. State Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) ("The court's role in deciding a motion for summary judgment is to identify factual issues, not to resolve them." (emphasis and internal quotation marks omitted)); PHP Healthcare Corp. v. EMSA Ltd. P'ship, 14 F.3d 941, 944 n.3 (4th Cir. 1993) ("By definition, no findings of material facts that were in genuine issue are possible in granting summary judgment." (internal quotation marks omitted)).

We review an award of summary judgment de novo, guided by the same legal principles that were applicable below. See News

40

& Observer Publ'g Co. v. Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010). Heeding those principles, we conclude that summary judgment was inappropriate on the present record.

1.

The district court's denial of discovery and failure to adhere to the summary judgment standard marred its assessment of, inter alia, the City's contention that the Ordinance targets misleading commercial speech and thus is subject to rational basis (rather than strict) scrutiny. While the strict scrutiny standard generally applies to content-based regulations, including compelled speech, see Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641-42 (1994), less-demanding standards apply where the speech at issue is commercial. Disclosure requirements aimed at misleading commercial speech need only survive rational basis scrutiny, by being "reasonably related to the State's interest in preventing deception of consumers." Zauderer v. Office of Disciplinary Counsel of the Supreme Court, 471 U.S. 626, 651 (1985) (explaining that, "because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, warnings or disclaimers might be appropriately required in order to dissipate the possibility of consumer confusion or deception" (alterations and internal quotation marks omitted)); accord

_Milavetz, Gallop & Milavetz, P.A. v. United States_, 130 S. Ct. 1324, 1339-40 (2010).[8]

a.

Although it may not ultimately prove meritorious, the City's commercial speech theory should not have been so easily dismissed by the district court. Under that theory, a limited-service pregnancy center

> proposes a commercial transaction every time it offers to provide commercially valuable goods and services, such as pregnancy testing, sonograms, or options counseling, to a consumer. Such an offer may take the form of an advertisement in the phone book, on the internet, or on a sign above the [center's] door. It may also take the form of an oral solicitation from a [center] staff member to a consumer. The City Council received evidence that many [centers] intentionally mislead consumers about the scope of services they offer to obtain the patronage of those seeking abortion and comprehensive birth control services. The Ordinance regulates a [center's] offer to provide services to consumers by making clear that the offer does not include abortion and comprehensive birth control services.

Reply Br. of Appellants 9-10 (citations omitted).

---

[8] While disclosure requirements aimed at misleading commercial speech are subject to the rational basis test, "restrictions on nonmisleading commercial speech regarding lawful activity must withstand intermediate scrutiny — that is, they must 'directly advanc[e]' a substantial governmental interest and be 'n[o] more extensive than is necessary to serve that interest.'" _Milavetz_, 130 S. Ct. at 1339 (alterations in original) (quoting _Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y._, 447 U.S. 557, 566 (1980)). Because the City contends that the Ordinance regulates misleading commercial speech, our focus is on the potential applicability of rational basis scrutiny.

The threshold question presented is whether the speech regulated by the Ordinance is actually commercial. That analysis is fact-driven, due to the inherent "difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." See City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 419 (1993). On one occasion, in Central Hudson Gas & Electric Corp. v. Public Service Commission of New York, the Supreme Court defined commercial speech as "expression related solely to the economic interests of the speaker and its audience." 447 U.S. 557, 561 (1980). But the Court has noted that commercial speech is "usually defined as speech that does no more than propose a commercial transaction." United States v. United Foods, Inc., 533 U.S. 405, 409 (2001); see also Bd. of Trs. of the State Univ. of N.Y. v. Fox, 492 U.S. 469, 473-74 (1989) (pronouncing "propose a commercial transaction" to be "the test for identifying commercial speech" (emphasis added)). The Court has also described the proposal of a commercial transaction — e.g., "'I will sell you the X prescription drug at the Y price,'" Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, 425 U.S. 748, 761 (1976) — as "the core notion of commercial speech." Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983). The City insists that limited-service pregnancy center advertising easily satisfies the "propose a commercial transaction" test. See Br. of

43

Appellants 22 ("When a [center] proposes that a woman patronize its establishment for the purpose of obtaining commercially valuable goods and services[,] . . . it is proposing a commercial transaction.").

Nevertheless, even where speech "cannot be characterized merely as proposals to engage in commercial transactions," the speech may yet be deemed commercial; in that event, "proper classification as commercial or noncommercial speech . . . presents a closer question." Bolger, 463 U.S. at 66; see also Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin., 191 F.3d 429, 440 (4th Cir. 1999) ("In the abstract, the definition of commercial speech appears to be fairly straightforward, if somewhat circular:  it is speech that proposes a commercial transaction.   In practice, however, application of this definition is not always a simple matter." (citations and internal quotation marks omitted)).   From Bolger, courts of appeals have gleaned "three factors to consider in deciding whether speech is commercial:   (1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914, 933 (3d Cir. 1990) (citing Bolger, 463 U.S. at 66-67); accord, e.g., Spirit Airlines, Inc. v. U.S. Dep't of Transp., 687 F.3d 403, 412 (D.C. Cir. 2012); United

44

States v. Benson, 561 F.3d 718, 725 (7th Cir. 2009); Adventure Commc'ns, 191 F.3d at 440-41. While "[t]he combination of all these characteristics . . . provides strong support for the . . . conclusion that [speech is] properly characterized as commercial speech," Bolger, 463 U.S. at 67, it is not necessary that each of the characteristics "be present in order for speech to be commercial," id. at 67 n.14.

Here, the district court abruptly concluded, "[u]nder both Bolger and Central Hudson," that "the speech regulated by the Ordinance is not commercial speech." O'Brien, 768 F. Supp. 2d at 813. Focusing on the plaintiff Center, the court reasoned that "[t]he overall purpose of the advertisements, services, and information offered by the CENTER is not to propose a commercial transaction, nor is it related to the CENTER's economic interest." Id. Rather, the court determined, "[t]he CENTER engages in speech relating to abortion and birth-control based on strongly held religious and political beliefs rather than commercial interests or profit motives." Id. (citing official statement of Catholic Church).

Ruling thusly, the district court accepted as fact the Center's assertion that its motives are entirely religious or political. But that assertion was not at all undisputed. Thus, discovery is needed to substantiate, inter alia, whether the Center possesses economic interests apart from its ideological

45

motivations. Such discovery is "especially important" where, as here, "the relevant facts are exclusively in the control of the [summary judgment movant]" or the "case involves complex factual questions about intent and motive." See Harrods Ltd., 302 F.3d at 247.[9]

In any event, the potential commercial nature of speech does not hinge solely on whether the Center has an economic motive, as even Bolger does not preclude classification of speech as commercial in the absence of the speaker's economic motivation. See 463 U.S. at 67 n.14. Because the Ordinance compels a disclaimer, the "lodestars in deciding what level of scrutiny to apply . . . must be the nature of the speech taken

---

[9] Even though the Center has averred that it does not charge women for its services, inquiring into the Center's potential profit motives may not be a futile endeavor. We know that nonprofit entities with religious or political motives can engage in commerce. See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me., 520 U.S. 564, 573 (1997) ("Even though petitioner's camp does not make a profit, it is unquestionably engaged in commerce, not only as a purchaser, but also as a provider of goods and services." (citations omitted)); Va. Vermiculite, Ltd. v. W.R. Grace & Co.-Conn., 156 F.3d 535, 541 (4th Cir. 1998) (explaining that nonprofit land preservation organization's acceptance of land donation "was fundamentally commercial"). Furthermore, although outwardly the Center appears to be driven by religious purposes only, certain operational intricacies may prove otherwise. For example, as another court observed in a similar case at the preliminary injunction stage, if the Center were "referring women to pro-life doctors in exchange for 'charitable' contributions, the analysis could change." See Evergreen Ass'n, Inc. v. City of N.Y., 801 F. Supp. 2d 197, 206 n.5 (S.D.N.Y. 2011).

46

as a whole and the effect of the compelled statement thereon." Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 796 (1988). In other words, context matters. From a First Amendment free speech perspective, that context includes the viewpoint of the listener, for "[c]ommercial expression not only serves the economic interest of the speaker, but also assists consumers and furthers the societal interest in the fullest possible dissemination of information." See Cent. Hudson, 447 U.S. at 561-62; see also Va. State Bd. of Pharmacy, 425 U.S. at 756 ("Freedom of speech presupposes a willing speaker. But where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." (footnote omitted)).

The Supreme Court of North Dakota employed just such an analysis in Fargo Women's Health Organization, Inc. v. Larson, 381 N.W.2d 176 (N.D.), cert. denied, 476 U.S. 1108 (1986). There, the plaintiffs alleged that the defendant Help Clinic, "through false and deceptive advertising and related activity, misleads persons into believing that abortions are conducted at the clinic with the intent of deceptively luring those persons to the clinic to unwittingly receive anti-abortion propaganda." Id. at 177. The trial court entered a preliminary injunction barring "all deceptive advertising and related solicitation practices," and the Help Clinic appealed. Id. Notwithstanding

the Help Clinic's assertion "that its communication is not commercial speech because no financial charges are assessed against persons receiving services from the clinic," the state supreme court deemed the clinic's advertisements to be commercial speech. Id. at 180-81. The court explained that "the degree, if any, that monies are received by the Help Clinic from its clients [is not] dispositive [of the commercial speech issue]." Id. at 180. It was "[m]ore important[]" to the court that "the Help Clinic's advertisements are placed in a commercial context and are directed at the providing of services rather than toward an exchange of ideas." Id. at 181. "In effect," the court concluded, "the Help Clinic's advertisements constitute promotional advertising of services through which patronage of the clinic is solicited, and in that respect constitute classic examples of commercial speech." Id.[10]

In contrast to the preliminary injunction at issue in Larson, our review today is of a permanent injunction entered in

---

[10] The Larson decision, though certainly not binding here, illuminates the potential inefficacy of the analogy drawn by the district court between the Center's free services and "sacramental wine, communion wafers, prayer beads, [and] other objects with commercial value" offered by churches to their congregants. See O'Brien, 768 F. Supp. 2d at 814. Unlike the latter, the former are alleged by the City to be the subject of advertisements "placed in a commercial context," "directed at the providing of services rather than toward an exchange of ideas," and designed to solicit patronage of the Center. See Larson, 381 N.W.2d at 181.

the absence of a fully developed record. Without all the pertinent evidence — including evidence concerning the Center's economic motivation (or lack thereof) and the scope and content of its advertisements — we cannot properly analyze the speech regulated by the Ordinance. Cf. Milavetz, 130 S. Ct. at 1344-45 (Thomas, J., concurring in part and concurring in the judgment) ("[B]ecause no record evidence of Milavetz's advertisements exists to guide our review, we can only speculate about the ways in which the [disclosure requirement] might be applied to Milavetz's speech."). Put succinctly, the district court should have likewise refrained from immediately deciding the commercial speech issue.[11]

---

[11] Although discovery is needed before this matter can be fairly decided, the existing record is not devoid of relevant evidence. For example, the Maryland Report included in the Ordinance's legislative record contains an online advertisement for Option Line, the "live contact center" co-established by national umbrella organizations Heartbeat International and Care Net that "provides 24/7 assistance to women and girls seeking information about pregnancy resources." J.A. 381. The advertisement states, inter alia, that Option Line's "consultants will connect you to nearby pregnancy centers that offer the following services": "Free pregnancy tests and pregnancy information"; "Abortion and Morning After Pill information, including procedures and risks"; "Medical services, including STD tests, early ultrasounds and pregnancy confirmation"; and "Confidential pregnancy options." Id. (emphasis omitted). The City characterizes the advertisement as deceptive, because it "does not indicate that the 'medical services' and 'confidential pregnancy options' offered by the centers exclude abortion and comprehensive birth control services." Br. of Appellants 8. Additionally, the City connects the advertisement to the plaintiff Center and several (Continued)

49

b.

The district court's hasty decision cannot be excused by its ruling that any commercial speech regulated by the Ordinance "'is inextricably intertwined with otherwise fully protected speech,'" thus triggering strict scrutiny. See O'Brien, 768 F. Supp. 2d at 814 (quoting Riley, 487 U.S. at 796). The Riley decision addressed the constitutionality of North Carolina's "requirement that professional fundraisers disclose to potential donors, before an appeal for funds, the percentage of charitable contributions collected during the previous 12 months that were actually turned over to charity." 487 U.S. at 795. Defending that statutory provision, the State argued that it "regulates only commercial speech because it relates only to the professional fundraiser's profit from the solicited contribution." Id. The Supreme Court assumed "that such speech in the abstract is indeed merely 'commercial,'" but concluded that the speech loses "its commercial character when it is inextricably intertwined with otherwise fully protected speech," i.e., the informative and persuasive aspects of the fundraiser's solicitation. Id. at 796.

---

other Baltimore limited-service pregnancy centers, in that each is an affiliate of Heartbeat International or Care Net. See J.A. 228, 241.

50

Equating Baltimore's Ordinance with the statutory requirement at issue in Riley, the district court relied on its own speculative finding that "[t]he dialogue between a limited-service pregnancy center and an expectant mother begins when the client or prospective client enters the waiting room of the center." See O'Brien, 768 F. Supp. 2d at 814. Furthermore, the court prematurely and perhaps inaccurately characterized that disclaimer as "a stark and immediate statement about abortion and birth-control," i.e., a declaration that abortion and birth control are morally acceptable options. Id.

Significantly, discovery could refute the district court's factual assumptions. Discovery might also show that any commercial aspects of a limited-service pregnancy center's speech are not "inextricably intertwined" with its fully protected noncommercial speech. See Hunt v. City of L.A., 638 F.3d 703, 715 (9th Cir. 2011) ("[W]here the two components of speech can be easily separated, they are not 'inextricably intertwined.'" (citing Fox, 492 U.S. at 473-74 (concluding that commercial speech aspect of "Tupperware parties" was not inextricably intertwined with noncommercial instruction on home economics))). That is, a fully developed record could demonstrate that "[n]othing in the [Ordinance] prevents [a center] from conveying, or the audience from hearing, . . . noncommercial messages, and nothing in the nature of things

51

requires them to be combined with commercial messages." See Fox, 492 U.S. at 474. In those circumstances, the rational basis test would be the applicable one.

2.

The district court further erred in precipitately concluding that the Ordinance is an exercise of viewpoint discrimination — the court's additional basis for applying strict scrutiny. See Sons of Confederate Veterans, Inc. v. Comm'r of the Va. Dep't of Motor Vehicles, 288 F.3d 610, 616 n.4 (4th Cir. 2002) ("The Supreme Court has indicated that a viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review." (citing R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 395-96 (1992))). That is, the court merely surmised that the Ordinance must have been discriminatorily aimed at pregnancy centers "with strict moral or religious qualms regarding abortion and birth-control," premised on its assumption that only those centers would never provide or refer for abortion or birth control. See O'Brien, 768 F. Supp. 2d at 815. But see Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 762-63 (1994) (explaining, in declining to apply strict scrutiny to "an injunction that restricts only the speech of antiabortion protestors," that "the fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based").

52

The district court failed to view the legislative record in the light most favorable to the City, and thus to credit evidence for summary judgment purposes that the Ordinance was enacted to counteract deceptive advertising and promote public health. Moreover, the court ignored the possibility that there may be limited-service pregnancy centers with no "moral or religious qualms regarding abortion and birth-control," and who refrain from providing or referring for abortion or birth control for other reasons.

Finally, applying strict scrutiny, the district court erred by determining that the Ordinance is not narrowly tailored because "a less restrictive alternative would serve the [City's] purpose." See United States v. Playboy Entm't Grp., Inc., 529 U.S. 803, 813 (2000). Even if strict scrutiny proves to be the applicable standard, the City must be accorded the opportunity to develop evidence relevant to the compelling governmental interest and narrow tailoring issues, including, inter alia, evidence substantiating the efficacy of the Ordinance in promoting public health, as well as evidence disproving the effectiveness of purported less restrictive alternatives to the Ordinance's disclaimer. See id. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").

C.

In sum, under the Federal Rules of Civil Procedure and controlling precedent, it was essential to the City's opposition to the Center's summary judgment motion — and to a fair and proper exercise of judicial scrutiny — for the district court to have awaited discovery and heeded the summary judgment standard. Meanwhile, the court could have averted any constitutional injuries that the Ordinance may inflict by preliminarily enjoining its enforcement. See Fed. R. Civ. P. 65; see also, e.g., Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd., 354 F.3d 249, 261 (4th Cir. 2003) (concluding that Newsom was entitled to a preliminary injunction on his First Amendment overbreadth claim, while cautioning that "our holding, like any ruling on a preliminary injunction, does not preclude a different resolution of Newsom's claims on a more fully developed record").

The district court in Centro Tepeyac v. Montgomery County, another Maryland pregnancy center-compelled disclosure case, proceeded in just that measured fashion. See 779 F. Supp. 2d 456 (D. Md. 2011). Mindful that the record was undeveloped and the County therefore unprepared to show otherwise, the court accepted at the preliminary injunction stage that strict scrutiny applied to the challenged disclosure requirement. See id. at 462-68. Importantly, however, the court did not

54

foreclose the possibility that evidence adduced in future discovery proceedings might render lesser scrutiny appropriate, e.g., if the County's Resolution were shown to regulate commercial speech. See id. at 463. Employing strict scrutiny to resolve the motion before it, the court preliminarily enjoined one portion of the Resolution's disclosure requirement (that "the Montgomery County Health Officer encourages women who are or may be pregnant to consult with a licensed health care provider"), but not the other (that "the Center does not have a licensed medical professional on staff"). See id. at 469-72. In doing so, the court credited the County's asserted compelling interest in preserving public health, and deemed "the record . . . at least colorable at this stage to suggest that the [non-enjoined portion of the disclosure requirement] is narrowly tailored to meet the interest." Id. at 471. The court further concluded that the County was unlikely to prove narrow tailoring of the enjoined portion of the disclosure requirement, articulating particular concern that it constituted "unneeded speech," and also noting several possible less restrictive alternatives. Id. at 468-69 & n.9, 471.

Today, alongside this opinion, we issue a separate opinion in which we affirm the Centro Tepeyac preliminary injunction decision, concluding that "the district court acted well within its discretion" and "commend[ing] the court for its careful and

55

restrained analysis." See Centro Tepeyac v. Montgomery Cnty., No. 11-1314(L), slip op. at 3, 18 (4th Cir. July __, 2013) (en banc). Our good dissenting colleagues overplay Centro Tepeyac, repeatedly invoking it as the ultimate word on the First Amendment issues presented herein. See, e.g., post at 81 (Niemeyer, J., dissenting) (characterizing our remand of this case for discovery on the commercial speech issue as "curious" in view of our affirmance of "the district court's conclusion in Centro Tepeyac that a similar Montgomery County, Maryland provision compelled noncommercial speech"); id. at 98 (asserting that Centro Tepeyac "hold[s]" that the County is not entitled to discovery on the effectiveness of purported less restrictive alternatives); id. at 101 (citing Centro Tepeyac for the proposition that City of Baltimore Ordinance 09-252, "[o]n its face, . . . is overbroad and unconstitutional"). The dissenters thereby ignore crucial differences between that case and this one — most significantly, that Centro Tepeyac involves a mere preliminary injunction decision, rather than a final judgment bestowing permanent injunctive relief on the basis of a summary judgment award.

As the Supreme Court has instructed, where a preliminary injunction is under an interlocutory examination, determining whether the district court abused its discretion "is the extent of our appellate inquiry." See Doran v. Salem Inn, Inc., 422

56

U.S. 922, 934 (1975), followed by Giovani Carandola, Ltd. v. Bason, 303 F.3d 507, 521 (4th Cir. 2002) ("We make no prediction as to the outcome at trial but simply hold, as the Supreme Court did [in Doran], that '[i]n these circumstances, and in the light of existing case law, we cannot conclude that the District Court abused its discretion by granting preliminary injunctive relief.'" (second alteration in original) (quoting Doran, 422 U.S. at 934)). Faithful to the abuse-of-discretion standard, we are obliged to affirm in Centro Tepeyac because the district court "applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying dispute." See slip op. at 18. Neither the district court's Centro Tepeyac decision — nor ours in that case — settles the constitutional questions posed; rather, both leave those issues to be decided on a more fully developed record in properly conducted proceedings.

Consistently with Centro Tepeyac, we conclude herein that the district court erred by entering a permanent injunction without allowing discovery or adhering to the applicable summary judgment standard. Despite this prudent, restrained, and — above all — evenhanded ruling, the dissenters accuse us of all manner of improprieties. Most disappointingly, they depict us, on the one hand, as pro-choice zealots who have engaged in

57

"gratuitous shaping of the issues" and "become seduced by [our] own elaboration of abortion policy." Post at 81-82 (Niemeyer, J., dissenting); see also post at 74 (Wilkinson, J., dissenting) ("In strongly implying that the Ordinance will survive First Amendment scrutiny, the majority has established a principle that will bite the very hands that feed it. For compelled speech can serve a pro-life agenda for elected officials as well as a pro-choice one.").

On the other hand, we are reproached for "an amorous affair with litigation," an "enchantment with extended procedures," and an "infatuation with discovery," as well as for "opin[ing] on various points of civil procedure" when we could be discussing "the dangers of state-compelled speech." Post at 62, 68, 71 (Wilkinson, J., dissenting). The dissenters would wholly exempt the Center from fundamental procedures to which all civil litigants are both subject and entitled. And, though the dissenters candidly acknowledge that "the district court engaged hypothetically from time to time in discussion about the potential relevance of facts," they unhesitatingly endorse the court's summary judgment decision. Post at 82 (Niemeyer, J., dissenting). Indeed, the dissenters freely layer their own supposition on the district court's, admitting of no other conclusion than that the Ordinance should be enjoined against all Baltimore limited-service pregnancy centers for all time.

We, however, are not so dismissive of the Federal Rules of Civil Procedure, which, as the Supreme Court has underscored, "are designed to further the due process of law that the Constitution guarantees."  Nelson v. Adams USA, Inc., 529 U.S. 460, 465 (2000).  Esteem for our bedrock procedural rules should be expected, rather than ridiculed.  And it is particularly appropriate here, where because of the ready availability of preliminary injunctive relief, there simply is no need to abridge the City's due process rights in favor of the Center's free speech guarantee.[12]

---

[12] It bears noting that the dissenters find it necessary to distort our decision in an effort to refute it.  For example, they erroneously say that we "fail[] to recognize that the challenge addressed by the district court was the plaintiffs' facial challenge," and that we "recharacterize[] the proceeding as an as-applied challenge" just so we can "identify questions of fact to support [our] remand."  Post at 79 (Niemeyer, J., dissenting); see also post at 71-72 (Wilkinson, J., dissenting) (asserting that, in "a tragedy for free expression," we insist the district court "undertook an as-applied analysis").  In reality, we amply discuss the facial/as-applied distinction, ultimately concluding that "regardless of the type of analysis utilized — facial or as-applied — the court abused its discretion by failing to recognize and honor the City's right to discovery."  Supra Part II.A.2.

The dissenters also incorrectly assert that we "fail[] to recognize the scrutiny applicable to regulations that compel speech," going so far as to claim that we "do[] not even discuss 'compelled speech.'"  Post at 78-79 (Niemeyer, J., dissenting) (citing Turner Broad. Sys., 512 U.S. at 641-42).  But see supra Part II.B.1 (explaining that, "[w]hile the strict scrutiny standard generally applies to content-based regulations, including compelled speech, less-demanding standards apply where the speech at issue is commercial" (also citing Turner Broad. (Continued)

59

Notwithstanding the dissenters' unfair and overwrought characterization, our ruling today is simply this: the district court improperly denied the City essential discovery and otherwise flouted the Federal Rules of Civil Procedure.

---

Sys., 512 U.S. at 641-42)). Even so, the dissenters concede that the Ordinance regulates both commercial and noncommercial speech, but surmise that enough noncommercial speech is implicated to render the Ordinance facially unconstitutional. See post at 92-93 (Niemeyer, J., dissenting) (contending that any "commercial motive" of the plaintiff Center is irrelevant, because the Ordinance "reaches beyond this one pregnancy center and imposes the requirement of a disclaimer sign on every speaker — commercial or not — who provides information 'for a fee or as a free service'"). But see Stevens, 130 S. Ct. at 1587 (explaining that, to prove overbreadth, a plaintiff may show that "a substantial number of [a statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" (internal quotation marks omitted)); Bolger, 463 U.S. at 67 n.14 (declining to preclude classification of speech as commercial in absence of speaker's economic motivation).

Finally, we note that the dissenters also distort the existing record, repeatedly asserting that "the City's stated interest [is] in prohibiting [limited-service] pregnancy centers, as a health concern, from misrepresenting information about abortions." Post at 77 (Niemeyer, J., dissenting); see also id. at 83, 93-94, 100, 101. To be sure, the record includes allegations that such centers provide misinformation about abortion (e.g., that it causes breast cancer). The City has clearly and consistently articulated its position, however, that the Ordinance is aimed at the pregnancy center practice of employing deceptive advertising to attract women seeking abortion and comprehensive birth-control services, and then using delay tactics to impede the women from accessing those services. The City has not asserted, as the dissenters claim, that the Ordinance is intended "to remedy misrepresentations being made by these pregnancy centers about abortion." See id. at 100.

60

Consequently, we vacate the judgment and remand for further proceedings.

## III.

Nevertheless, we affirm the district court's ruling that St. Brigid's and the Archbishop lack standing to be co-plaintiffs in this action with the Center. See O'Brien, 768 F. Supp. 2d at 811-12. We do so having carefully considered the contentions made by St. Brigid's and the Archbishop in their cross-appeal, and having reviewed the dismissal of their claims de novo. See Benham v. City of Charlotte, N.C., 635 F.3d 129, 134 (4th Cir. 2011) ("The issue of standing to sue is a legal question that we assess de novo.").

## IV.

Pursuant to the foregoing, we vacate the district court's judgment against the City and remand for such other and further proceedings as may be appropriate. We affirm, however, the court's dismissal of the claims of St. Brigid's and the Archbishop for lack of standing, leaving only the Center's claims for resolution on remand.

No. 11-1111 VACATED AND REMANDED
No. 11-1185 AFFIRMED

WILKINSON, Circuit Judge, dissenting:

In a case concerning a law that requires private, noncommercial organizations to convey a government-authored message, one would expect to find at least some acknowledgement of the dangers of state-compelled speech. But one will search the majority's opinion in vain for any such recognition. Instead, the majority opts to opine on various points of civil procedure, apparently oblivious to the fact that litigation is not an end in itself, but a means of vindicating the substantive values underlying our legal order, among which I had hitherto supposed were the freedoms of conscience and belief.

Those freedoms are at the heart of this case, though one would never know it from the majority's opinion, which glosses over the impact of the Baltimore Ordinance on the right of the plaintiff Center not to be compelled by the state to express a message at odds with its most intimate beliefs. Today it is the Center; tomorrow it is who knows what speaker and who can guess what view. Because the majority fails to respect the Center's right not to utter a state-sponsored message that offends its core moral and religious principles, and because it launches a litigious fusillade aimed at smothering the Center's right to simple silence, I respectfully dissent.

Given the dearth of discussion about the evils of compelled speech in the majority opinion, it is worth pausing to consider what is at stake when government forces private individuals or organizations to speak on its behalf. We now take it for granted that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." W. Va. State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943). Regrettably, this constitutional star was not always so fixed. In fact, the Supreme Court had earlier upheld a law that required school children to participate in a daily flag-salute ceremony in Minersville School District v. Gobitis, 310 U.S. 586 (1940). In his opinion for the Court in Gobitis, Justice Frankfurter declared the flag-salute ceremony an essential means of fostering "[n]ational unity," which, in turn, he regarded as "the basis of national security." Id. at 595. When opponents of a compelled flag salute protested, Justice Frankfurter retorted that forced salutes helped to inculcate "that unifying sentiment without which there can ultimately be no liberties, civil or religious." Id. at 597.

In confusing mere statism with patriotism, Justice Frankfurter also posited a cramped conception of the freedom of speech. Specifically, he denied that the right to speak entails a right not to speak. In a lone dissent, Frankfurter reaffirmed this view even as the Court reversed course and declared compulsory flag-salute laws unconstitutional. So long as a law "suppresses no belief nor curbs it," he insisted -- so long as it permits individuals to "believe what they please, avow their belief and practice it," leaving "[a]ll channels of affirmative free expression . . . open" -- it does not violate the freedom of speech guaranteed by the First Amendment. Barnette, 319 U.S. at 664 (Frankfurter, J., dissenting).

Justice Frankfurter's opinions in the flag-salute cases mark a singular blot on a long and storied career. He simply failed to grasp a truth that had been "well known to the framers of the Bill of Rights," id. at 633 (majority opinion): that "[t]he right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind,'" Wooley v. Maynard, 430 U.S. 705, 714 (1977) (quoting Barnette, 319 U.S. at 637). Because government can infringe this freedom not only through naked censorship but by compelling individuals to utter words that the state wishes uttered, courts must scrutinize both kinds of regulation with

64

the same skepticism.  No American is the mere mouthpiece of the state.  That is the enduring lesson of the flag-salute cases.

B.

It is a lesson the majority has failed to learn.  While it perfunctorily acknowledges that laws compelling speech are "generally" subject to strict scrutiny, maj. op. at 41, it follows Justice Frankfurter in downplaying the impact of such laws on the individuals who are compelled to speak.  As the majority apparently sees it, the Ordinance requires organizations like the Center to make nothing more than an anodyne factual statement identifying the services they do not provide, without having to condone those services.  See maj. op. at 51-52.

But the majority utterly fails to appreciate the nature of the Center's beliefs.  The Center has "sincerely held" "moral, ideological, political, and religious beliefs" that abortion and at least some forms of birth control are profoundly wrong and thus are not to be chosen.  Complaint ¶¶ 43, 40.  The Ordinance requires the Center to state that it "does not provide or make referral for abortion or birth-control services." J.A. 26.  The conflict between the Center's beliefs and the mandated disclosure is thus plain: where the Center wishes to guide women toward alternatives to abortion and birth control, the Ordinance

65

requires it to indicate at the outset that those services are readily available, just not at the Center itself.

The flag-salute ceremony may not have compelled Jehovah's Witnesses to affirm the American flag as an idol or the United States as a deity in so many words, but from their perspective, that was the import of the ritual. The same is true here. Although the Ordinance does not compel the Center to explicitly countenance abortion and birth control, it does compel the Center to present them as viable options -- which, of course, is precisely what the Center denies they are. Putting aside altogether the matter of abortion, about which people of good will may and do differ, imagine any of us being told by the state to renounce ourselves in such a basic way.

Echoing Justice Frankfurter's rejoinder to the Jehovah's Witnesses in the flag-salute cases, the City responds by noting that pregnancy centers remain free to express their disapproval of abortion and birth control alongside the mandatory disclaimer. But the Supreme Court rightly found this response unavailing in Barnette, and it is no more persuasive here. In each case, the speaker is put in the position of having to explain a statement made in its voice but not from its heart. Only because the Ordinance compels the Center to mention abortion and birth control in the first place must it start from

a stance of opposing those options, rather than from one of simply advocating alternatives like adoption and abstinence.

Compelled speech can be all the more pernicious because of its context. So it is here. Whether or not the Ordinance is technically viewpoint-discriminatory, this much can be said: it compels groups that oppose abortion to utter a government-authored message without requiring any comparable disclosure -- or indeed any disclosure at all -- from abortion providers. Seventy years after the flag-salute cases, it should be axiomatic that the First Amendment prohibits the government from dictating the terms of private expression, let alone in such a one-sided manner. Faced with the inadequacy of its reasons, the majority responds with only noise, making believe it has somehow been accused of various "improprieties," maj. op. at 57, and "zealous" pro-choice views, id., when the only issue in reality is that the grand neutrality at the heart of the First Amendment has been compromised. Those who support most firmly a woman's right to reproductive choice should find it the most disheartening that the court's First Amendment jurisprudence is trampling expressive privacy and marching backward through time.

## II.

The majority would have us believe that it has issued nothing more than a cut-and-dried procedural ruling, merely

67

ordering "essential discovery" into a few key factual questions in the case. Maj. op. at 33. Don't be fooled. The majority is conducting an amorous affair with litigation that is anything but benign. For the infatuation here is indiscriminate. The majority neglects to pose the most relevant question: whether its enchantment with extended procedures will serve to vindicate the assertion of a constitutional right or to suffocate it. Perhaps it evades this question because the answer is so obvious. By bringing the full brunt of the litigative process to bear on the Center, the majority is imposing a high price on the Center (and by extension any speaker) for attempting to vindicate its free-speech rights.

Most troubling, the majority has licensed a fishing expedition into the Center's motivations and operations on the off chance that it might turn up some vaguely "commercial" activity. The majority appears to recognize that the Center's speech clearly lies far from "the core notion of commercial speech," since none of its advertisements propose a commercial transaction. Maj. op. at 43 (quoting Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983)); see United States v. United Foods, Inc., 533 U.S. 405, 409 (2001) (noting that commercial speech is "usually defined as speech that does no more than propose a commercial transaction"). Nevertheless, the majority believes that "discovery is needed to substantiate,

68

inter alia, whether the Center possesses economic interests apart from its ideological motivations." Maj. op. at 45-46. Not even the City had the temerity to second-guess the Center's motives in this way. And yet, the majority displays no compunction about doing so, subjecting the Center to intrusive and burdensome discovery based on a few far-fetched hypotheticals regarding "the Center's potential profit motives" and its "operational intricacies." Maj. op. at 46 n.9.

Ordering discovery on this tenuous a basis would entail delays and costs even in the ordinary case. But the delays and costs are especially onerous where, as here, the party that is subjected to discovery has so plainly suffered a violation of its constitutional rights. By encouraging the City to pry into every corner of the Center's operations, the majority heavily penalizes this organization for attempting to defend its constitutional rights, a penalty that will only dissuade future victims of constitutional violations -- and especially those who hold to the Center's persuasion -- from bringing suit in the first place. Where discovery should be a means of vindicating constitutional rights, the majority converts it into a process that strangles them.

The majority's approach also excuses the City's rush to regulate the Center's speech, rather than consider other ways of achieving the purposes underlying the Ordinance. There has

69

never been any dispute that the Ordinance forces organizations like the Center to communicate a message they would otherwise never utter. Given the dangers of compelled speech, this kind of mandated disclosure should be a last resort, not a first recourse. See Riley v. Nat'l Fed'n of the Blind of N.C., Inc., 487 U.S. 781, 800 (1988) (noting "the First Amendment directive that government not dictate the content of speech absent compelling necessity, and then, only by means precisely tailored").

Thus, before enacting the Ordinance, the City should at least have considered less restrictive alternatives and indicated why those alternatives would be ineffective. And yet, the City points to not a single portion of the 239-page legislative history submitted as part of this litigation indicating that it ever took these elementary steps. See J.A. 192-430. What testimony was delivered and evidence presented before the City Council appears to have focused on the City's interest in enacting the Ordinance rather than the question of whether the Ordinance was a narrowly tailored means of serving that interest. Especially telling is the absence of any statement of legislative findings indicating why less restrictive alternatives would come up short. This is not for a lack of such alternatives. As the district court noted, many suggest themselves. See O'Brien v. Mayor & City Council of

70

<u>Balt.</u>, 768 F. Supp. 2d 804, 817 (D. Md. 2011). Posting warning signs in its own voice outside the Center, undertaking a public information effort of its own, or applying the anti-fraud provisions in state law are all alternatives that the City now seems eager to reject but nowhere indicates it ever considered or tried.

Without ever having contemplated these options, the City now asserts that they will prove ineffective, and based on that bald assertion, the majority unlocks the doors of discovery. The lesson of the majority's ruling for other legislative bodies is clear: compel speech before considering less restrictive alternatives, and you will be granted discovery to prove why those alternatives are ineffective after the fact. This upends the notion that compelled speech should be a last resort, encouraging legislatures to adopt the most constitutionally offensive option rather than the least. In this respect as well, the majority renders litigation a threat to liberty rather than its safeguard.

The majority's infatuation with discovery is compounded by its similarly misguided affection for as-applied challenges. Although the district court construed the Center's claim as a facial challenge, the majority insists it actually undertook an as-applied analysis. <u>See</u> maj. op. at 37-38. But this conclusion, aside from being incorrect, is a tragedy for free

71

expression. For it means that, even if the Center ultimately prevails on its First Amendment claim, other centers with similar moral or religious beliefs will each have to bring their own suits challenging the Ordinance as applied to them. This is a war of attrition. By requiring every pregnancy center to bring its own as-applied challenge and to submit to separate investigation, the majority invites piecemeal litigation that will dramatically increase the costs for the centers of vindicating their First Amendment rights. Free speech should never be held hostage to this kind of duplicative and intrusive litigation.

The majority responds by doubling down on the virtues of extended litigation. It pens a final ode to discovery, maj. op. at 59, again ignoring the question of when that discovery serves a salutary purpose and when it simply chokes off constitutional rights as it does here. This is by no means to suggest that affording the government discovery is inappropriate in every constitutional case. But one does not need discovery to discover the obvious. Here, the infringement of the Center's free-speech rights is patent and profound, and the alternatives to a mandatory disclaimer are myriad. I recognize that the Center's views on the issues surrounding abortion rights are controversial. But the First Amendment is not needed to protect speech that elicits broad popular approbation. "The test of

[freedom's] substance is the right to differ as to things that touch the heart of the existing order." Barnette, 319 U.S. at 642. If there was ever a case for entering judgment in order to forestall government action that threatens to deter disfavored speakers from defending their First Amendment rights, this case is it.

Indeed, the Supreme Court has only recently reiterated the "basic First Amendment principle that freedom of speech prohibits the government from telling people what they must say." Agency for Int'l Development v. Alliance for Open Society Int'l, Inc., No. 12-10, slip op. at 6 (U.S. June 20, 2013) (internal quotation marks omitted). Even when direct appropriations are involved, the government may not control an organization's core message outside of the confines of the program being funded. See id. at 15 (holding that a government requirement that "compels as a condition of federal funding the affirmation of a belief that by its nature cannot be confined within the scope of the Government program. . . . violates the First Amendment"). Here, of course, funding conditioned upon speech is not at issue. Compelled speech becomes all the more invasive when it is simply commanded without any corresponding benefit to the recipient. The recipient of public funds at least theoretically has some choice about whether to accept the aid with its attendant conditions. Id. at 7. In the instant

73

case, the Center gains no benefit and has no choice but to speak, and the coercion is complete.

## III.

To my good colleagues in the majority, all I can say is, "Be careful what you wish for." In strongly implying that the Ordinance will survive First Amendment scrutiny, the majority has established a principle that will bite the very hands that feed it. For compelled speech can serve a pro-life agenda for elected officials as well as a pro-choice one. Cf. Planned Parenthood Minn., N.D., S.D. v. Rounds, 686 F.3d 889 (8th Cir. 2012) (en banc). It is easy to imagine legislatures with different ideological leanings from those of the Baltimore City Council enacting measures that require organizations like Planned Parenthood to post a statement in their waiting rooms indicating what services they do not provide. Indeed, after today's decision, I would expect a flurry of such measures.

When this court finally confronts a pro-life analogue of the Baltimore Ordinance, it will face a dilemma. Either it will uphold the measure, in which case it will simply confirm what today's decision suggests: that the government does have the power after all to "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion [and to] force citizens to confess by word or act their faith

74

therein." Barnette, 319 U.S. at 642. Or it will invalidate the measure, in which case the First Amendment will have ceased to function as a neutral arbiter of our nation's ideological disputes, but will instead have become a tool to serve the policy predilections of the judges who happen to be applying it in any given case. Either way, we will have warped First Amendment doctrine beyond recognition, and we shall have but ourselves to blame.

IV.

Compelled speech can get tricky quickly. The state possesses a broad police power to regulate for the health and safety of its citizens, which includes the authority to require the disclosure of limited amounts of accurate information. See, e.g., Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio, 471 U.S. 626, 650-53 (1985). Compelled speech is thus not an all-or-nothing matter. See Centro Tepeyac v. Montgomery Cnty., No. 11-1314 (4th Cir. 2013) (en banc) (Wilkinson, J., concurring). But as the flag-salute cases teach us, the state generally may not force individuals to utter statements that conflict with beliefs so profound that they define who we are. How to balance the state's responsibility to protect its citizens with the individual's interest in staying

75

true to conscience is a perennial question that will prove vexing in many cases.

This case, however, is not vexing. The Baltimore Ordinance demands that organizations like the Center affirm a proposition they vehemently deny. It is, moreover, a law in search of a problem about which the City and majority speculate but cannot identify. The City made no attempt to try or even consider alternative approaches that would have allowed it to achieve its purposes without compelling the Center to say a word. Wherever the First Amendment might draw the line between state regulation and individual conscience, this law crosses it. To the infirmities of the law, the majority adds burdens beyond measure on freedom of the mind.

I respectfully dissent.

NIEMEYER, Circuit Judge, dissenting:

Baltimore City Ordinance 09-252 mandates that pregnancy centers that do not offer abortions or refer for abortions must post one or more signs in their waiting rooms, stating that they "do[] not provide or make referral for abortion or birth-control services." On the plaintiffs' assertion that such a sign requires them to speak contrary to their moral and religious beliefs, the district court held, as a matter of law, (1) that the ordinance, on its face, compels speech that is not content neutral; (2) that such compelled speech is subject to strict scrutiny; and (3) that the ordinance is not narrowly tailored to serve the City's stated interest in prohibiting such pregnancy centers, as a health concern, from misrepresenting information about abortions. It thus found the ordinance unconstitutional.

A ruling of this kind does not implicate a need to have discovery of factual circumstances, as the majority opinion orders, because every point on which the district court's ruling depended was a question of law that construed the ordinance on its face and assessed its scope against well-established First Amendment principles. In determining to vacate the district court's order and remand the case, the majority opinion addresses a case not before us. The opinion fails in three fundamental respects.

77

First, it fails to address the actual holding of the district court insofar as the district court applied established legal principles to conclude, as a matter of law, that the ordinance was unconstitutional. Rather, it dismisses the district court's ruling as "laden with error," pointing to a raft of circumstantial factual questions, irrelevant to the necessary legal propositions, and concluding that the legal issues therefore cannot be resolved by summary judgment.

Second and more fundamentally, it fails to recognize the scrutiny applicable to regulations that compel speech -- regulations that require a person to say that with which the person would not otherwise say and might well disagree. Such regulations are among the most pernicious invasions of First Amendment rights, and for that reason, they are subject to "the most exacting scrutiny." Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 641-42 (1994). Although distinct from laws that regulate what persons have chosen to say, regulations that compel people to speak the government's message are equally invasive of our most basic freedom. Id. "Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech." See Riley v. Nat'l Fed. of the Blind of N.C., Inc., 487 U.S. 781, 795 (1988). And because it is "content-based," it is subject to strict scrutiny. Turner Broadcasting, 512 U.S. at 642. Indeed, "[c]ontent-based

[speech] regulations are <u>presumptively invalid</u>." <u>R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 382 (1992) (emphasis added). The majority opinion not only fails to recognize these principles, it does not even discuss "compelled speech." Rather, it implies, by its silence on the subject, that compelled speech or content-based speech, when including potentially commercial speech, is subject to a relaxed level of scrutiny, a position never countenanced by the Supreme Court.

And <u>third</u>, it fails to recognize that the challenge addressed by the district court was the plaintiffs' <u>facial</u> challenge. In an effort to identify questions of fact to support its remand, the opinion ignores the issue presented -- <u>i.e.</u>, whether a <u>facial</u> review would render the ordinance unconstitutional -- and recharacterizes the proceeding as an <u>as-applied</u> challenge. With that erroneous maneuver, it concludes that facts need to be developed to conduct such an as-applied challenge. <u>Ante</u>, at 38 ("But to properly employ an as-applied analysis, the court was obliged to first afford the City discovery"). To be sure, the complaint challenged the ordinance both facially and as-applied, but the plaintiffs argued before the district court that on Count I (violation of free speech), the court could rule on the ordinance "as a facial matter." And in its opinion, the district court accepted this, repeating that in the plaintiffs' claims against the City, the plaintiffs

79

"contend[ed] that the Ordinance [was] facially invalid." O'Brien v. Mayor & City Council of Baltimore, 768 F. Supp. 2d 804, 808 (D. Md. 2011). The court then proceeded to address the case as a facial challenge, stating, "In the instant case, the Court must examine whether the Ordinance, on its face, is subject to, and satisfies, the applicable level of scrutiny." Id. at 810 (emphasis added).

Thus, to conclude that the district court's holding was "laden with error," ante, at 10, the majority opinion itself is error-laden, giving the governing core principles the back of the hand and broadening, by recharacterization, the issues so as to be able to conclude that the City should have been given the opportunity to engage in discovery, even as to subjects that would be irrelevant or unnecessary to the legal questions decided by the district court. It is apparent that the majority opinion, which is some 50 typewritten pages, roams in supposition about what pregnancy centers that do not offer abortion have said to their clients; about whether their advice could have been commercial in nature; and about the facts that might have been misrepresented, as identified by pro-choice groups in their stated policy positions. For example, the majority opinion quotes at length: (1) the Waxman report, which suggests the pregnancy centers "often mask their pro-life mission" to mislead pregnant women; (2) the report of the NARAL

Pro-Choice Maryland Fund that pregnancy centers give "wildly inaccurate information" about abortion; (3) the legislative testimony of a woman who stated she had "felt tricked" by a pregnancy center 16 years before; and (4) the legislative testimony of a professor who stated that she was "distressed by the existence of centers" that misrepresent their mission. The majority sets forth no similar evidence provided by the plaintiffs, yet it relies on the City's claimed need to respond to the plaintiffs' facts.

In its gratuitous shaping of the issues, the majority also devotes pages to speculation about whether the ordinance regulates commercial speech or noncommercial speech -- failing to recognize that, on its face, the ordinance regulates both. The majority's position is curious in view of the fact that it has today affirmed the district court's conclusion in Centro Tepeyac that a similar Montgomery County, Maryland provision compelled noncommercial speech and that any commercial speech was intertwined with regulated noncommercial speech. See Centro Tepeyac v. Montgomery Cnty., ___ F.3d ___, No. 11-1314(L), at ___ (4th Cir. June ___, 2013) (en banc) (observing that the district court "demonstrated a firm grasp of the legal principles"). Here, in contrast, the majority concludes that resolution of the question must be "fact-driven." It states, "Without all the pertinent evidence -- including evidence

81

concerning the Center's economic motivation (or lack thereof) and the scope and content of its advertisements -- we cannot properly analyze the speech regulated by the Ordinance." Ante, at 49. But this speculation is irrelevant because Ordinance 09-252 regulates both commercial and noncommercial speech and addresses all persons who provide pregnancy services without providing abortions or referring for abortions.

Were our court grappling with the abortion issue itself, the majority's fulsome and overstated facts might mean something. But the case before us presents the much narrower question about the scope of the ordinance on its face. It appears that the majority has become seduced by its own elaboration of abortion policy from the viewpoint of some interested groups, thereby blinding it from the narrow legal issue raised by the terms of the ordinance.

The district court, on the other hand, correctly focused on the relevant legal issue and, in a reasoned fashion, supported its holding by analyzing the ordinance's language. To be sure, the district court engaged hypothetically from time to time in discussion about the potential relevance of facts, but it quickly left them, recognizing that the well-established First Amendment principles on which it relied provided for a resolution of the issue as a matter of law. As it stated, "In the instant case, the Court must examine whether the Ordinance,

82

on its face, is subject to, and satisfies, the applicable level of scrutiny." O'Brien, 768 F. Supp. 2d at 810 (emphasis added). And from the language of the ordinance, it concluded that the strict-scrutiny standard applied and that the ordinance did not meet that standard. Nowhere did the district court consider or decide an as-applied review.

I respectfully submit that under the well-established First Amendment principles relating to compelled speech, Baltimore City Ordinance 09-252 cannot, on its face, withstand strict scrutiny. The ordinance is content-based, telling a person, not otherwise regulated, what to say to a client, even though the person may disagree with the speech and would not otherwise say what is commanded. The mandate is imposed on all pregnancy centers not providing or referring for abortion, whether they are commercial or noncommercial or whether they provide services for free or for a fee. Although the City may have a compelling interest in prohibiting the misrepresentation of information about abortion, as it claims, the ordinance on its face does not prohibit misrepresentation. Indeed, it mandates speech regardless of whether the pregnancy center misrepresents or not. These statutorily based observations lead to the legal conclusion that the ordinance is overbroad and therefore unconstitutional. To reach that conclusion does not require discovery of the circumstantial facts about how the ordinance

might apply in any given circumstance. I conclude that the majority's decision to remand for the development of irrelevant facts is simply misguided.

The district court's decision should be affirmed.

I

By way of background, the City of Baltimore enacted Ordinance 09-252 in December 2009, regulating all pregnancy centers that provide pregnancy related services for free or for a fee and that either do not provide abortions or refer for abortions. The ordinance requires each one of those centers to post one or more signs in its waiting room stating that the center "does not provide or make referral for abortion or birth-control services."

The legislative record indicates that the President of the Baltimore City Council introduced Bill 09–0406 (the future Ordinance 09–252) after meeting with abortion-rights advocacy groups. Those groups complained that some pregnancy clinics provide inaccurate information to women about abortions. A spokesperson for the City Council President explained in a public statement: "The bill deals with whether women are told up front what the facts are. Women need to know up front what to expect when they go into these centers." The "Bill Synopsis" presented to the City Council stated that the Bill was

"introduced because of the 'importance of choice.'" And the Baltimore City Health Department backed the Bill, based on the "purpose of the bill to require limited-service pregnancy centers to provide accurate information about available services to clients and potential clients." (Emphasis added). The Bill was enacted in November and became law on December 4, 2009.

In March 2010, before any enforcement of Ordinance 09-252, the Archbishop of Baltimore, St. Brigid's Roman Catholic Church, and the Greater Baltimore Center for Pregnancy Concerns, Inc. ("the Pregnancy Center") commenced this action against the Mayor and City Council of Baltimore, challenging the constitutionality of the ordinance and alleging that it violates the Free Speech and Free Assembly Clauses of the First Amendment, the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Conscience Clause in Maryland Code Ann., Health-Gen. § 20-214(a).

The complaint alleges that the Pregnancy Center is a "limited-service pregnancy center," as defined in Ordinance 09-252, operating in Baltimore City from two locations. The Center provides free services to pregnant women, such as pregnancy testing; classes in prenatal development, post-pregnancy parenting, and life skills; Bible studies; and material support for women through its "Hannah's Cupboard" program, including diapers, formula, baby and maternity clothes, toys, and books.

85

It also provides women with information on "abstinence and natural family planning, which are recognized forms of birth control," but does not provide referrals for abortions or other methods of birth control, asserting that it does not do so "[b]ased on moral and religious beliefs." The Pregnancy Center does not charge its clients for its services.

The complaint alleges that Ordinance 09-252 specifically targets pro-life pregnancy centers such as the Pregnancy Center and thus "regulates communications at the Pregnancy Center that are personal, moral, religious, and political." It also states that "[b]y requiring a disclaimer that the Center does not provide or refer for abortions, the Ordinance compels Plaintiffs to deliver the implied message that these services are available elsewhere and should be considered," thus appearing to legitimize such services, in violation of the plaintiffs' beliefs. The complaint objects to the ordinance's requirement that the Pregnancy Center "post a sign saying that it does not provide birth-control services," when in fact it does "in the form of education about abstinence and natural family planning." The plaintiffs seek a declaratory judgment that the ordinance is unconstitutional on its face and/or as applied to them and an injunction prohibiting the ordinance's enforcement. Some two months after they filed their complaint, but before the City filed its answer, the plaintiffs also filed a motion for partial

86

summary judgment on their free speech and equal protection claims.

The City argued that the plaintiffs' summary judgment request was premature in that the City had not been afforded the opportunity to conduct discovery or to fully develop expert testimony on key factual issues. The City contended that it needed "to conduct discovery concerning the advertising that the Pregnancy Center and other limited-service pregnancy centers employ . . . [to] demonstrate its deceptive character." The City also asked for discovery "to develop factual support for [the City's] argument that the services offered by [the Center] are a form of commerce, and, therefore, the disclaimer required by the Ordinance is commercial speech, subject only to rational basis scrutiny -- not strict scrutiny." Finally, the City asked for "the opportunity to develop expert testimony to provide factual support for the propositions that deceptive advertising by limited-service pregnancy centers threatens public health in a variety of ways."

Following a hearing on the motion for summary judgment, as well as on other motions, the district court entered an order dated January 28, 2011, denying the City's request for further discovery on the ground that it was not necessary to the issue being decided; granting the Pregnancy Center's motion for summary judgment on its free speech claim; and entering a

87

judgment permanently enjoining the enforcement of the ordinance. In granting summary judgment to the Pregnancy Center, the court held that Ordinance 09-252 was unconstitutional based on its legal conclusions that the ordinance compelled speech; that it was content-based and therefore subject to strict scrutiny; and that it was not narrowly tailored to fit the City's stated interest in enacting the ordinance. O'Brien, 768 F. Supp. 2d at 812-14, 816-17.

II

This is not a hard case, and the First Amendment analysis is straightforward.

For a facial challenge, we look to the face of the ordinance and are "careful not to go beyond [its] facial requirements and speculate about 'hypothetical' or 'imaginary' cases." Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449-50 (2008). But the assessment may consider the application of the regulation to others, not just to the plaintiffs, to determine whether there are conceivable instances of overbreadth. See Bd. of Trustees of State Univ. of N.Y. v. Fox, 492 U.S. 469, 483-84 (1989). Thus, when conducting a facial review under the First Amendment, we "construe the statute and determine whether 'a substantial number of its applications are unconstitutional, judged in relation to the

statute's plainly legitimate sweep.'" Preston v. Leake, 660 F.3d 726, 739 (4th Cir. 2011) (quoting United States v. Stevens, 559 U.S. 460, 130 S. Ct. 1577, 1587 (2010)).

Ordinance 09-252 targets "limited-service pregnancy centers," which are defined as "any person"

> (1) whose primary purpose is to provide pregnancy-related services; and
>
> (2) who:
>
>> (i) for a fee or as a free service, provides information about pregnancy-related services; but
>>
>> (ii) does not provide or refer for:
>>
>>> (A) abortions; or
>>>
>>> (B) nondirective and comprehensive birth-control services.

Baltimore City Health Code § 3-501 (emphasis added). Under the ordinance, "[a] limited-service pregnancy center must provide its clients and potential clients with a disclaimer substantially to the effect that the center does not provide or make referral for abortion or birth-control services." Id. § 3-502(a). This disclaimer must be made through one or more "easily readable" signs that are "conspicuously posted in the center's waiting room" and written in English and Spanish. Id. § 3-502(b). The failure to comply with the terms of the ordinance is punishable by a citation carrying a maximum civil penalty of $150. Id. § 3-506(a).

On its face, Ordinance 09-252 compels speech. A pregnancy center that does not provide or refer for abortions must post the sign containing the mandated language. A pregnancy center is thus required to participate in the City's effort to tell pregnant women that abortions are available elsewhere as a presumably acceptable alternative, regardless of the moral and religious beliefs of the center.

As a matter of logic and Supreme Court precedent, "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech." Riley, 487 U.S. at 795. Accordingly, compelled speech must be addressed as "a content-based regulation of speech." Id. (citing Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 256 (1974)). Of course, a content-based speech regulation is subject to the "most exacting scrutiny," the strict scrutiny standard. Turner Broadcasting, 512 U.S. at 642; Riley, 487 U.S. at 796; see also United States v. Playboy Entm't Group, Inc., 529 U.S. 803, 813 (2000). Indeed, strict scrutiny applies even in cases where the compelled disclosure is limited to factually accurate or non-ideological statements. Riley, 487 U.S. at 797-98; Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston, 515 U.S. 557, 573 (1995) ("[The] general rule that the speaker has the right to tailor the speech, applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact").

90

In an effort to avoid strict scrutiny of Ordinance 09-252, the City contends that the ordinance compels only commercial speech and therefore is subject to a lower level of scrutiny. Commercial speech is defined as "expression related solely to the economic interests of the speaker and its audience." Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 561 (1980). The hallmark of commercial speech is that it "does no more than propose a commercial transaction." Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 66 (1983) (internal citation and quotation marks omitted). In some circumstances, speech may be classified as commercial even when it "cannot be characterized merely as proposals to engage in commercial transactions." Id.; see also id. at 67-68 (holding that advertisements discussing the health benefits of contraceptives were commercial speech); Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 370 (4th Cir. 2012) (holding that business' outdoor mural was commercial speech where business conceded that the mural was advertising, the mural included part of the business' logo, and the business "had an economic motivation for displaying the painting"). But speech does not "retain[] its commercial character when it is inextricably intertwined with otherwise fully protected speech." Riley, 487 U.S. at 796.

91

Here, the enacted text forecloses the City's argument that the ordinance targets only commercial speech because the ordinance imposes a disclosure requirement on all speakers, regardless of economic motivation. The ordinance applies wholesale to any person who "for a fee or as a free service" provides information about pregnancy. The ordinance thus imposes its disclosure requirement wholly indifferent to whether the speaker "propos[es] a commercial transaction." Central Hudson, 447 U.S. at 562; see also Centro Tepeyac v. Montgomery Cnty, 779 F. Supp. 2d 456, 463-65 (D. Md. 2011) (noting that similar provisions applying to persons who provide services for free "cannot rely on commercial speech cases"), affirmed, Centro Tepeyac, ___ F.3d at ___, No. 11-1314(L), at 11-12.

In a similar effort to avoid the application of strict scrutiny, the majority maintains that the commercial speech inquiry is "fact-driven" and that therefore "discovery is needed to substantiate . . . whether the Center possesses economic interests apart from its ideological motivations." Ante, at 45-46. But this approach is flawed. The Pregnancy Center's motivation for its provision of free information is irrelevant to the inquiry of whether the ordinance, on its face, compels noncommercial speech. The ordinance reaches beyond this one pregnancy center and imposes the requirement of a disclaimer sign on every speaker -- commercial or not -- who provides

92

information "for a fee or as a free service." The plain language of the ordinance focuses not on the economic motive of the person, but on the content of the person's speech. It is therefore untenable for the majority to assert that the commercial motive of this pregnancy center is a relevant fact yet to be determined.

Thus, as a noncommercial, content-based regulation, the ordinance is subject to strict scrutiny, see Centro Tepeyac, 779 F. Supp. 2d at 468 (holding, with respect to a similar provision, that "strict scrutiny applies"), affirmed, Centro Tepeyac, ___ F.3d at ___, No. 11-1314(L), at 12, and "[c]ontent-based [speech] regulations are presumptively invalid," R.A.V., 505 U.S. at 382. The City bears the burden of rebutting the presumption of invalidity. See Playboy Entm't Group, 529 U.S. at 816-17. Indeed, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." Id. at 818. The City can, nonetheless, rebut the presumption if it is able to show that the ordinance is "narrowly tailored to promote a compelling Government interest." Id. at 813. And to do this, it must show that the ordinance is the least restrictive alternative to serve the government's purpose. Id.; Ashcroft v. ACLU, 542 U.S. 656, 666 (2004).

The City maintains that it has a compelling government interest in assuring, as a health concern, that pregnancy

93

centers do not misrepresent information about abortion, a concern that it grounds in the Waxman Report and the report of the NARAL Pro-Choice Maryland Fund. It also contends that the ordinance narrowly addresses this concern by requiring pregnancy centers to post the mandated sign in their waiting rooms.

The district court accepted the City's stated interest in the ordinance as a compelling one and elected to assess the question of whether the ordinance was narrowly tailored to serve that interest. I too would bypass any inquiry about the sufficiency of the City's stated government interest and address the question of whether it is narrowly tailored. If the ordinance is not narrowly tailored to serve the City's stated interest, then it must be invalidated as unconstitutional.

The inquiry into whether Ordinance 09-252 is narrowly tailored is a purely legal question: "Whether [a] regulation meets the 'narrowly tailored' requirement is of course a question of law . . . ." United States v. Doe, 968 F.2d 86, 88 (D.C. Cir. 1992); see also Vill. of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980) (whether an ordinance is overbroad is "a question of law that involved no dispute about the characteristics of" the plaintiff). A statute is narrowly tailored only "if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988). "Broad prophylactic rules in

94

the area of free expression are suspect. Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." NAACP v. Button, 371 U.S. 415, 438 (1963) (citations omitted).

A regulation is not narrowly tailored when, among other things, (1) it does not advance the purported compelling interest, e.g., Meyer v. Grant, 486 U.S. 414, 426 (1988); (2) it is overinclusive, e.g., Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd., 502 U.S. 105, 121–23 (1991); or (3) the government has other, less speech-restrictive alternatives available, e.g., Playboy Entm't Group, 529 U.S. at 816–17. Ordinance 09-252 fails under all three tests.

First, the ordinance does not target the stated government interest of eliminating false advertising. It does not even mention false advertising, and its substance does not address it.

Second, the ordinance is overinclusive because it applies equally to pregnancy centers regardless of whether they advertise and, if they advertise, regardless of whether they engage in false advertising. See FEC v. Mass. Citizens for Life, Inc., 479 U.S. 238, 265 (1986) (stating that for a law to be narrowly tailored "government must curtail speech only to the degree necessary to meet the particular problem at hand" and

95

"must avoid infringing on speech that does not pose the danger that has prompted regulation").

Third, several alternatives to address the problems purportedly targeted by the ordinance are available and would impose a lesser burden on speech. Most obviously, the City could speak with its own voice. It might, for example, use its own resources to undertake public education campaigns addressing the alleged dangers of pregnancy centers or, more generally, promoting consultations with physicians for pregnant women. Cf. 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484, 507 (1996) ("It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance. . . . [E]ducational campaigns focused on the problems of excessive, or even moderate, drinking might prove to be more effective"). This is the same alternative that the district court found available in Centro Tepeyac, 779 F. Supp. 2d at 469 n.9, to support in part its finding that a similar provision was likely unconstitutional and that this court affirmed in Centro Tepeyac, ___ F.3d at ___, No. 11-1314(L) at 13-14.

As another alternative, the City could produce a document or website listing local pregnancy centers and noting what services are available at each. See Riley, 487 U.S. at 800

96

("[T]he State may itself publish the detailed financial disclosure forms it requires professional fundraisers to file. This procedure would communicate the desired information to the public without burdening a speaker with unwanted speech").

And as yet another alternative, the City could always pursue the option of prosecuting violations of its criminal and civil laws that proscribe false or deceptive advertising. See Riley, 487 U.S. at 800; see also Nefedro v. Montgomery Cnty., 996 A.2d 850, 863 (Md. 2010) (holding that fraud laws were a less restrictive alternative to a law prohibiting remuneration for fortune-telling).

That the City resorted to speech restrictions before trying these or other less restrictive alternatives is more than enough to render the ordinance unconstitutional. See Thompson v. Western States Med. Ctr., 535 U.S. 357, 373 (2002) ("If the First Amendment means anything, it means that regulating speech must be a last -- not first -- resort").

The additional discovery ordered by the majority would not eliminate or even mitigate these narrow-tailoring problems. The ordinance's infirmity in this regard is apparent on its face. Cf. Sable Commc'ns of Cal., Inc. v. FCC, 492 U.S. 115, 129 (1989) (affirming district court's grant of preliminary injunction where the pre-enactment record contained "no legislative findings that would justify us in concluding that

97

there is no constitutionally acceptable less restrictive means, short of a total ban, to achieve the Government's interest"); Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1274 (11th Cir. 2005) (invalidating content-based sign regulation on appeal from the denial of a preliminary injunction because "[t]he First Amendment questions . . . [were] purely legal" and "only minimally intertwined with the facts").

Tellingly, the majority does not dispute the fact that discovery would not be needed to determine whether the language of the ordinance advances the stated government interest or is overinclusive -- two of the three ways that can render an ordinance not narrowly tailored. But it nonetheless states that the City "must be accorded the opportunity to develop evidence disproving the effectiveness of purported less restrictive alternatives to the Ordinance's disclaimer." Ante, at 53; cf. Centro Tepeyac, ___ F.3d at ___, No. 11-1314(L), at 13-14 (holding to the contrary with respect to a similar provision). It is remarkable that this is discovery that the City never requested.

Finally, the majority adds the careless declaration that:

[T]he City must be accorded the opportunity to develop evidence relevant to the compelling governmental interest and narrow tailoring issues, including, inter alia, evidence substantiating the efficacy of the Ordinance in promoting public health.

98

<u>Ante</u>, at 53.  This declaration of loosely mixed principles is, as it stands, irrelevant to any issue, but it appears mostly to collapse two burdens that the government has under strict scrutiny.  First, the government was required to advance a compelling governmental interest in mandating speech.  With respect to that, the majority fails to recognize that the district court <u>assumed</u> that the government had appropriately claimed a compelling interest in prohibiting the misrepresentation of information about abortion.  Thus, there is no issue of fact to resolve.  Second, the government had the burden to show that its regulation of speech -- <u>i.e.</u>, mandating the posting of a sign with specific content in pregnancy centers' waiting rooms -- was narrowly tailored to serve the compelling governmental interest.  As to this, the majority fails to recognize that that issue was a question of law.  <u>See</u> <u>Village of Schaumburg</u>, 444 U.S. at 634; <u>Doe</u>, 968 F.2d at 88.  To resolve such a question of law, all that need be done is an analysis of the statute's language to determine if it "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  <u>Frisby</u>, 487 U.S. at 485.

In short, to respond to the self-evident proposition that discovery is not needed in resolving questions of law, the majority fabricates fact issues where none exist and then criticizes the dissenting opinions, stating, "The dissenters

99

would wholly exempt the Center from fundamental procedures to which all civil litigants are both subject and entitled." Ante, at 58. Indeed, it inflates the postured balloon, suggesting even a constitutional issue in denying discovery. See ante, at 59 ("We, however, are not so dismissive of the Federal Rules of Civil Procedure, which, as the Supreme Court has underscored, 'are designed to further the due process of law that the Constitutional guarantees'"). The majority's drama about its role in protecting the Federal Rules of Civil Procedure and the U.S. Constitution does not, however, advance its argument that it can ignore the reality that the district court ruled on questions of law, questions that do not need discovery to resolve.

### III

At bottom, we have a City ordinance that targets, on its face and by design, all pregnancy centers that do not provide abortions or do not refer clients for abortions. Purportedly to remedy misrepresentations being made by these pregnancy centers about abortion, the ordinance requires each center to put a sign in its waiting room announcing to clients that the abortion alternative is not provided at the center, even though such center might hold the view that abortion should not be considered as an alternative at all. Such an approach invades

the most fundamental freedom of speech, mandating that the pregnancy centers speak a message with which they profoundly disagree. Even though the City may have a compelling interest in preventing misrepresentations about abortion, it is not free to impose a requirement of speech on those who do not misrepresent. Ordinance 09-252 mandates the antidote on <u>all</u> persons who refuse to provide or refer for abortion, regardless of whether they have misrepresented or are misrepresenting abortion information. On its face, the ordinance is overbroad and unconstitutional. <u>See</u> <u>Centro Tepeyac</u>, 779 F. Supp. 2d at 468-69 (holding similar provision likely not narrowly tailored), <u>affirmed</u>, <u>Centro Tepeyac</u>, ___ F.3d at ___, No. 11-1314(L), at 13-14.

The majority, however, refuses to consider the legal questions raised by the Pregnancy Center's facial challenge and reaches, in its far-ranging opinion, irrelevant and ideological facts about a case not presented to conclude that summary judgment was inappropriate. I disagree and conclude that the district court properly recognized the issues that could be decided as a matter of law and found the ordinance unconstitutional. That legal analysis is not a difficult one

101

and, I submit, readily leads to the district court's conclusion.

Accordingly, I would affirm.[*]

Judges Wilkinson, Shedd, and Agee have asked me to show them as joining this opinion.

_____

[*] While I dissent from the court's remand, I concur in its judgment that the Archbishop and St. Brigid's Catholic Church lack standing to challenge the ordinance.